**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 28 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

JACQUELINE M. DOEBELE,

      Plaintiff-Appellant,

v.

No. 01-3372

SPRINT/UNITED MANAGEMENT
COMPANY and SPRINT
SPECTRUM, L.P.,

      Defendants-Appellees.

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 00-CV-2053-KHV)**

Dennis E. Egan, The Popham Law Firm, P.C., Kansas City, Missouri, for
Plaintiff-Appellant.

William E. Quirk (Karen R. Glickstein and Monica M. Fanning, of Shughart
Thomson & Kilroy, L.C., Kansas City, Missouri, on the brief), for Defendants-
Appellees.

Before **SEYMOUR**, **ANDERSON** and **O'BRIEN**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Jacqueline Doebele sued her former employer, Sprint/United Management Company and Sprint Spectrum, L.P. (Sprint), alleging claims under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (ADA), the Family and Medical Leave Act, 29 U.S.C. § 2615 (FMLA), and Kansas state law, arising from the termination of her employment with Sprint as a financial analyst. Ms. Doebele alleged that Sprint discriminated against her in violation of the ADA by refusing to provide reasonable accommodation for her mental disabilities and by discharging her, and retaliated against her for exercising her rights under the ADA, the FMLA, and the workers compensation laws of Kansas. The district court granted summary judgment for Sprint on all claims, *see Doebele v. Sprint Corp.*, 157 F. Supp. 2d 1191 (D. Kan. 2001), and denied Ms. Doebele's post-judgment motions for relief, *see Doebele v. Sprint Corp.*, 168 F. Supp. 2d 1247 (D. Kan. 2001).

Ms. Doebele appeals, contending the district court erred by: (1) considering and relying upon evidence presented for the first time in Sprint's reply pleading in the summary judgment proceedings, or alternatively by refusing to grant her motion to file a surreply; (2) weighing the evidence against her in concluding as a matter of law that she was not a "qualified individual with a disability" within the meaning of the ADA; (3) weighing the evidence against her in concluding as a matter of law that she had not shown Sprint's reasons for her termination were a

pretext for retaliation in violation of the ADA and the FMLA; and (4) in granting summary judgment against her on her state law claim that Sprint fired her in anticipation that she would file a workers compensation claim. We affirm in part, reverse in part, and remand for further proceedings.

## I

In determining whether summary judgment is warranted, we review the district court's order de novo. *See Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1255 (10th Cir. 2001). Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Selenke*, 248 F.3d at 1255-56. Viewed most favorably to Ms. Doebele, the record reveals the following background to this litigation.

Ms. Doebele graduated from Kansas State University in 1984 with a degree in business administration and an emphasis in accounting. After working in other financial and accounting positions, she began employment with Sprint in September, 1996, as a financial analyst and remained in that capacity until her

employment was terminated on April 20, 1999. She was supervised by Lorrie McCurdy, who in turn answered to Bridget Carson. Ms. Doebele received merit pay increases, although in less than the maximum amount, in 1996, 1997, 1998, and in 1999 shortly before she was fired. Her job performance appraisals for 1996 and 1997 indicated that she met expectations, although she did not receive the highest rating available. She was not given a formal performance evaluation in 1998, but met with her supervisor in April 1999 to discuss her performance shortly before her employment was terminated.

By all accounts the working environment in Ms. Doebele's department was not pleasant. The work load was heavy, several of the employees did not get along with one another, and rumors and gossip added to the negative work environment. In 1997, Ms. Carson referred Ms. Doebele to the Employee Assistance Program (EAP) after being told by another employee, Chris Fluke, that Ms. Doebele had made a comment about jumping off a bridge. Evidence in the record indicates that although this matter was to be kept confidential, word of the incident began to circulate. "Co-workers told [Ms. Doebele] that negative comments were being made concerning her character and mental stability. One co-worker told her that there were organized attempts to ostracize and fire her." *Doebele*, 157 F. Supp. 2d at 1196.

A memo of a meeting between Ms. McCurdy and Ms. Fluke dated June 16,

1997, reveals several instances in which Ms. Fluke brought to Ms. McCurdy's attention what Ms. Fluke considered work deficiencies on the part of Ms. Doebele and, in addition, informed Ms. McCurdy that two employees had told Ms. Fluke they felt physically threatened by Ms. Doebele. Ms. McCurdy stated in her memo:

> This is alarming. Not only is it horrible for someone to feel physically threatened at their job, but alarming that I see no signs to indicate such. This is not good. I will meet with each of the employees individually and refer them to EAP for any questions they might have. EAP is better qualified to answer questions in this area. My other concern is that neither employee has come to me with their concern which also makes me wonder how valid the claim is.

Aplt. App., vol. II at 579. Shortly thereafter Ms. McCurdy met with both employees identified by Ms. Fluke and both stated that they had no problems with Ms. Doebele and did not feel threatened by her. Ms. McCurdy noted in her memo of these meetings that "[i]t looks like Chris is orchestrating this." *Id.* at 582. Although Ms. Doebele stated at department group counseling sessions in November and December of 1997 that she felt ostracized as a result of the comments made by Ms. Fluke, no action was taken against Ms. Fluke.

On March 23, 1998, Ms. McCurdy gave Ms. Doebele a verbal warning for inappropriate email usage, tardiness, and inappropriate behavior in the

workplace.[1]  Ms. Doebele, along with a number of other employees, admittedly sent or received inappropriate emails.  It is also undisputed that Ms. Doebele was tardy on occasion.  The instances of inappropriate workplace behavior all involved Ms. Doebele's interactions with other department employees during which she allegedly became confrontational, angry or defensive.  Ms. Doebele believed these incidents were due to the fact that she was treated differently from other employees as a result of rumors in the workplace about her mental problems.  Evidence in the record indicates that Ms. Doebele's mental condition was a topic of conversation among the other employees in her department.

On July 22, 1998, after the verbal warning had become inactive, Ms. McCurdy placed Ms. Doebele on written warning.  The warning stated that it was the result of "four confrontational incidents" between Ms. Doebele and other employees, and phone calls from Ms. Doebele to employees "at home after work hours to discuss work-related issues at length."  Aplt. App., vol. I at 302.  The warning directed Ms. Doebele to have no closed-door meetings with other

---

[1] Sprint's employee discipline policy employed a four-step correction process.  At step one an employee was given a verbal reminder which was active for three months; at step two the employee was given a written reminder which was active for six months; at step three the employee received a final written warning which was active for twelve months; and at step four the employee was terminated.  An employee who was subject to an active warning when she received another warning would progress to the next step in the process.  If, however, the warning had become inactive, a new infraction would begin the progression at step one.

individuals, and instead to discuss issues in an open forum or a small conference that included her manager. It also directed Ms. Doebele to refrain from calling employees after work to discuss issues that could be handled during the work day.

The record indicates that sometime shortly before Ms. Doebele was given this warning, she spoke with Kim Klosak in Sprint's human resources department and said she felt she was being subjected to a hostile work environment. Ms. Klosak investigated the matter and believed Ms. Doebele was being set up, noting that two of the alleged confrontational incidents underlying the upcoming written warning involved employees who were friends with the people who admittedly wanted to "get rid of" Ms. Doebele. Aplt. App., vol. II at 513. Ms. Klosak had a meeting with Ms. Carson and Ms. McCurdy, whom the record indicates were the people who wanted to fire Ms. Doebele, and told them that harassment in the workplace violated Sprint policy. Ms. Klosak and Ms. Doebele discussed the situation with Abigail Dillard, the equal opportunity officer for Sprint. Ms. Dillard told Ms. Doebele to document the issue and send it to her.

Ms. Dillard also discussed Ms. Doebele's concern about a hostile work environment with Ms. McCurdy and Ms. Carson, and told them she would be conducting an investigation into the matters about which Ms. Doebele had raised concerns. Ms. Dillard knew that Ms. Doebele was going to be given the written warning and discussed that matter with Ms. McCurdy as well, pointing out that

the warning needed to be supported with written documentation. Ms. Dillard stated that she would have to be provided with appropriate documentation before she could agree that they needed to go to the next level of corrective action. As of Friday, July 17, 1998, Ms. Dillard had received no documentation from Ms. McCurdy that would support corrective action.

On Monday, July 22, Ms. McCurdy forwarded documentation to Ms. Dillard consisting of a memo from Roosevelt Draine dated July 19, 1998, describing a meeting he had with Ms. Doebele during the week of May 18, 1998, and a memo from Bonita Holland dated July 21, 1998, describing a conversation she had with Ms. Doebele on June 11, 1998. Ms. Dillard believed the incidents described in those memos should have been documented at the time they occurred. She discussed this problem with Ms. McCurdy and Ms. Carson, and asked them why the documentation had not been prepared contemporaneously with the events at issue, what investigation had been conducted, what counseling Ms. Doebele had received as a result, and whether some other form of corrective action had taken place. Ms. Dillard believed such actions should have been taken, particularly in view of the fact that Mr. Draine had stated in his memo he felt physically threatened during his meeting with Ms. Doebele. Ms. Dillard was concerned that the after-the-fact documentation was an attempt to build a file on Ms. Doebele to support a decision already made. She also expressed her view to

Anne Kinney, the director of the human resources department, who did not share Ms. Dillard's concerns. Ms. Doebele was given a written warning that day, July 17, 1998, despite Ms. Dillard's misgivings.

On the day she received her warning, Ms. Doebele saw Leonel Urdaneta, M.D., a psychiatrist, complaining of stress from her work, relational difficulties, and fear that she would lose her job. She reported previous similar episodes, one of which involved depression. Dr. Urdaneta diagnosed Ms. Doebele as suffering from bipolar disorder, attention deficit disorder (ADD), and hypothyroidism. He recommended that she be placed on short term disability leave. Ms. Doebele attempted unsuccessfully to return to work on September 29. She was seeing a counselor who reported to Dr. Urdaneta that Ms. Doebele had stayed away from work because her symptoms became worse when she returned. Dr. Urdaneta asked Sprint to excuse Ms. Doebele's absences on September 30, and October 1 and 2.

After Dr. Urdaneta placed Ms. Doebele on short term disability leave, she notified Ms. Dillard that she was not going to be at work, and Ms. Dillard in turn informed Ms. McCurdy and Ms. Carson. Ms. Dillard told them that an employee like Ms. Doebele had rights under the ADA and the FMLA, and raised the possibility that Ms. Doebele could file a workers' compensation claim on the basis of work-related stress. Ms. McCurdy and Ms. Carson nonetheless told Ms. Dillard that they wanted "to get rid" of Ms. Doebele. Aplt. App., vol. II at 525.

-9-

Ms. Dillard warned Ms. McCurdy and Ms. Carson that they risked committing unlawful acts as a result of their determination to terminate Ms. Doebele's employment. Based on information she had received, Ms. Dillard was concerned that Ms. Doebele would deliberately be overloaded with work and expressed this concern to Ms. Carson and Ms. Kinney. Ms. Dillard pointed out to Ms. McCurdy and Ms. Carson that Ms. Doebele's behavior could be related to her medical condition, and warned them that because of her disability they had to treat her with some care. Ms. Doebele returned to work in early October.

The record contains a memo to Ms. McCurdy dated October 29, 1998, from Linda Weidner, an employee who worked in Ms. Doebele's department, concerning the work environment there. Ms. Weidner recounted an instance in which another employee treated Ms. Doebele badly, suggesting the incident was the result of office politics. Ms. Weidner further stated: "I would also, as your friend, like to offer a word of caution. In some of the things I have heard you say lately, it could be interpreted that you have lost all objectivity when it comes to issues involving [Ms. Doebele]." *Id.* at 590. Ms. Weidner ended by asking to be allowed to apply for other positions outside the department, stating she could "not continue to work in such a hostile environment." *Id.*

On November 18, Ms. Doebele told her counselor her workload had tripled and she felt overwhelmed by some circumstances at work. The counselor

reported this to Dr. Urdaneta, who wrote a letter to Sprint stating that "[d]ue to [Ms. Doebele's] medical condition and recent short-term disability, we strongly recommend that Ms. Doebele not work more than 40 hours per week." *Id.* at 570. Ms. McCurdy said in an email to Ms. Carson that in her view the request was ridiculous and that she saw Ms. Doebele "building a case for a lawsuit or a reason to go on long-term disability." *Id.* 422. On December 3, 1998, Dr. Urdaneta wrote a letter to the human resources department opining that Ms. Doebele was unable to work November 30, and December 1 and 2.

On Friday, December 4, 1998, Ms. McCurdy placed Ms. Doebele on final written warning. The warning declared that Ms. Doebele's attendance since returning from her short term disability leave on September 28, 1998, was "interfering with [her] ability to perform [her] job functions," and that her inappropriate workplace behavior, in particular involving an incident the day before obtaining her doctor's release to return to work, "disrupted the workflow in the office." Aplt. App., vol. I at 303. The day Ms. Doebele was given this warning, Ms. Carson sent an email to John Meyer, the vice president to whom she reported, informing him the warning would be given and reminding him Ms. Doebele was "the individual that was out on disability for over 9 weeks." Aplt. App., vol. II at 597. Ms. Carson also sent an email to Ms. Kinney with a copy of the warning along with Ms. McCurdy's notes on the matter. The message stated

that "someone from network security will be 'around' during our discussions in the event the situation gets out of control." *Id.* Ms. Carson said she was afraid Ms. Doebele "could be volatile emotionally, could do something physical." *Id.* at 439-40. Ms. Kinney agreed.

Ms. Doebele saw Dr. Urdaneta on December 9, 1998, and he again placed her on disability leave as of the preceding Monday, December 7. Ms. Doebele had left a voice mail message with Ms. Dillard on the day she received the warning, stating that she wished to file a complaint of discrimination and hostile environment. Ms. Dillard told her to put it in writing and she would investigate it. Ms. Doebele did so and submitted it to Ms. Dillard on that Monday. Ms. Dillard emailed a copy of the complaint to Ms. Carson and told her Ms. Doebele had been placed on disability leave. She informed both Ms. Carson and Ms. McCurdy of Sprint's policy against retaliation, pointing out that employees had a right to file complaints and that no retaliatory actions could be directed against an employee for doing so. Ms. Dillard informed them that Ms. Doebele had been diagnosed with clinical depression and was on a suicide watch. Ms. Dillard told Ms. Doebele her complaint would be discussed upon her return to work.

When the original length of this disability leave period was extended, an exchange of emails by Sprint employees disclosed some concern in the human resources department over whether Ms. Doebele had made a timely request for an

extension of benefits and whether she had used up her leave under the FMLA. An email from Natalie Anderson in the human resources department stated Ms. Anderson had received a letter from Dr. Urdaneta's practice group dated December, 30, recommending that Ms. Doebele's leave continue. Ms. Anderson commented "[u]nfortunately, this counts as meeting the time frame (if there was a denial and an appeal) so we are in another pending status." *Id.* at 601.

Before Ms. Doebele was given the final warning, Ms. Dillard had warned Ms. McCurdy and Ms. Carson that in her view the proposed warning was illegal:

> I told them that you all are basically telling me that you want to get rid of this employee, she hasn't even returned to work yet, there's not been a fair opportunity for her to demonstrate her ability to improve her performance which is required under our policy; that I have a concern that you are going to have too much pressure on her, you are going to micromanage her and further make her environment hostile. . . . So I made them perfectly clear that I thought what they were doing would be unlawful, that the risk would be high for a complaint of discrimination and harassment or for a lawsuit. I communicated that to them and I communicated it to Anne Kinney.

*Id.* at 541-42. Ms. McCurdy and Ms. Carson responded that "we're going to follow the steps that we're required to follow, meaning we are going to gather the proper data, the proper documentation, and we're going to manage her performance but we are going to be on her all the time . . . ." *Id.* at 543. Ms. Dillard expressed the view that Ms. McCurdy and Ms. Carson

> wanted [Ms. Doebele] terminated and they weren't really satisfied with the track that I had them on to accommodate her, they wanted to get rid of her . . . as soon as possible, and that's part of the reason

-13-

why we see that [Ms. Doebele] was advised that the next thing that happened they would terminate her. I mean, that's part of the pressure they put on her to let her know they wanted her out of there.

*Id.* at 538.

Dr. Urdaneta determined that Ms. Doebele could commence trial employment on February 23, 1999. Accordingly, he wrote a letter dated February 22, 1999, to the human resources department at Sprint recommending the following work schedule:

> We recommend that she work 5 hours per day, 12 p.m. to 5:00 p.m. Monday through Friday, with a 40 hour per week schedule starting March 8, 1999. We would further recommend that Ms. Doebele be allowed to leave work for therapy, at first weekly, then moving to twice monthly schedule by April 15, 1999. We recommend the type of work to be limited stress situations, no supervisory responsibilities for the first 2 months of work, no more than 40 hours per week, and limited interpersonal relations.

Aplt. App., vol. I at 294. Ms. Carson wrote to Ms. Doebele the following day asking her to provide additional information from her doctor on what he meant by limited stress and limited interpersonal relations, why he recommended a five-hour work day the first two weeks, why her therapy could not be scheduled so as not to interfere with work hours, and to clarify her diagnosis. Dr. Urdaneta responded in a letter dated the next day explaining that his recommendations were intended to allow Ms. Doebele to adjust to the work schedule and its demands on a gradual basis. He also informed Sprint there was a four to five week waiting list for appointments after 4 p.m. and Ms. Doebele would be scheduled for one as

soon as possible but that she needed therapy in the meantime. Finally, Dr. Urdaneta diagnosed Ms. Doebele as suffering from a bipolar disorder.

In a letter dated March 8, 1999, two weeks after Dr. Urdaneta had cleared Ms. Doebele to return to work with the temporary accommodations, Ms. Carson wrote to Ms. Doebele informing her Sprint would only accommodate her request to work five-hour days for two weeks. Ms. Carson rejected the other accommodations however, stating that "the 'limited stress' and 'limited interpersonal relations' accommodations are not reasonable or required under the Americans with Disabilities Act (ADA). The job functions that you want modified are essential and required for the performance of your duties as a tables analyst." Aplt. App., vol. II at 605. Rather than offering Ms. Doebele a position in which these accommodations could be met, Ms. Carson declared that "[i]f you choose to return to work . . . , you will be expected to fully carry out all the duties of your job including, but not limited to, supervisory and interpersonal responsibilities. Should you choose not to return to work . . . , I will assume that you have voluntarily resigned your position." *Id.* No one from Sprint discussed with Ms. Doebele her requested accommodations, nor did anyone raise the possibility that she could transfer to another position even though Sprint was hiring 200-300 people a week at that time.

Upon receiving Ms. Carson's letter, Ms. Doebele called Ms. Kinney in the

-15-

human resources department and informed her that she believed her short term disability was work-related. Ms. Kinney responded that Sprint was not contesting the disability issue. Ms. Kinney then discussed with Ms. Carson the possibility that Ms. Doebele might file a legal action against Sprint. Ms. Dillard also discussed this possibility with Ms. McCurdy and Ms. Carson, pointing out that Ms. Doebele had indicated on her short term disability form that her disability was work-related. Although the human resources department sent Ms. Doebele the forms to file a workers compensation claim, she did not complete them because she believed Ms. Kinney was going to look into the matter.

Ms. Doebele returned to work on March 12, 1999. Her employment was terminated on April 20, allegedly due to attendance problems and lack of personal effectiveness. The termination notice did not provide any details supporting these reasons for discharge, and it is undisputed that Ms. Doebele still had plenty of time pool days[2] available and that she had been granted FMLA leave in July and December 1998.

Ms. Dillard had been eased out of the picture before Ms. Doebele's employment was terminated, and she did not know when Ms. Doebele was discharged. Ms. Carson had not been happy with Ms. Dillard's advice and had

---

[2]Under Sprint's "time pool" policy, an employee could "draw on a fixed amount of time off for vacation, personal, sick leave or other reasons." *Doebele v. Sprint Corp.*, 157 F. Supp. 2d 1191, 1196 (D. Kan. 2001).

taken the matter to Ms. Kinney, Ms. Dillard's director, who took Ms. Doebele's file from Ms. Dillard. Ms. Dillard stated that her notes on the investigation of Ms. Doebele's discrimination complaint and on the conversations she had with Ms. McCurdy and Ms. Carson advising them that their actions could be unlawful were not in the file at the time her deposition was taken.

Ms. Dillard believed that Ms. Doebele's termination for attendance issues was a "sham" because "we were dealing with an ADA issue." Aplt. App., vol. III at 805. According to Ms. Dillard, Sprint's treatment of Ms. Doebele differed from the treatment given to other employees with mental impairments that she had counseled. She stated that she had "worked on cases where attendance issues were much higher than this and people hadn't been put on corrective action yet." *Id.* at 807. She pointed out that because she had worked on numerous attendance cases, she was better able than Ms. McCurdy and Ms. Carson to determine whether Sprint's treatment of Ms. Doebele in this matter was consistent with its usual practice. Ms. Dillard stated that ordinarily managers took the advice given to them by the human resources department and wanted to ensure that they were not treating employees unlawfully. "[W]ith Jackie Doebele, . . . I don't know if it was personal, personality issues, or what, but these two managers were adamant about the fact that the end for this employee was going to come." Aplt. App., vol. II at 545. Both Ms. McCurdy and Ms. Carson told Ms. Dillard that they believed

-17-

Ms. Doebele posed a physical threat to other employees, and that her relationship with her co-workers was increasingly hostile.

**II**

After exhausting her administrative remedies, Ms. Doebele brought this action alleging that she was a qualified person with disabilities within the meaning of the ADA, and that Sprint discriminated against her on the basis of those disabilities in violation of the Act. She also asserted retaliation claims under the ADA and the FMLA, alleging Sprint retaliated against her for asserting her rights under those Acts. Finally, she contended Sprint retaliated against her in violation of state law by discharging her in anticipation that she would file a workers compensation claim.

The district court granted summary judgment for Sprint on all claims. The court ruled that Ms. Doebele had failed to show a prima facie case of discrimination under the ADA because she had not shown she was a qualified person with a disability within the meaning of the Act. In so doing, the court concluded Ms. Doebele had not shown an actual disability that limited one or more of her major life activities, or that she had a record of disability, or that Sprint regarded her as disabled. The court rejected Ms. Doebele's federal retaliation claims, concluding she had not shown a fact issue on whether Sprint's

legitimate reasons for her discharge were pretextual.  Finally, the court granted

summary judgment on Ms. Doebele's state law retaliation claim, holding that

because mental injuries are not compensable under the Kansas workers

compensation scheme absent physical injury, her retaliation claim was likewise

barred.  Ms. Doebele's appeal challenges all of these rulings.

## A.    Discrimination under the ADA

The ADA prohibits employment discrimination on the basis of an

employee's disability, stating that "[n]o covered entity shall discriminate against a

qualified individual with a disability because of the disability of such individual

in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and

privileges of employment."  42 U.S.C. § 12112.  To establish a prima facie case

of disability discrimination under the Act, a plaintiff must show that (1) she is

disabled within the meaning of the ADA; (2) she is qualified for her employment

position; and (3) the defendant discriminated against her because of her disability.

*See Poindexter v. Atchison, Topeka & Santa Fe Ry.*, 168 F.3d 1228, 1230 (10th

Cir. 1999).  The ADA defines disability as "(A) a physical or mental impairment

that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or (C) being regarded as having such an

-19-

impairment." 42 U.S.C. § 12102(2). Ms. Doebele alleged a claim under all three definitions and we address each in turn.

### 1. Actual Disability

Under subsection (A), a plaintiff must show that an impairment substantially limits at least one major life activity. *See Bristol v. Bd. of County Comm'rs*, 281 F.3d 1148, 1158 (10th Cir.), *rev'd in part on other grounds*, 312 F.3d 1213 (10th Cir. 2002) (en banc). This definition contains three elements. First, the plaintiff must have a recognized impairment; second, the plaintiff must identify one or more appropriate major life activities; and third, the plaintiff must show that the impairment substantially limits one or more of those activities. *Id.* at 1156. The plaintiff "must articulate with precision the impairment alleged and the major life activity affected by that impairment," *Poindexter*, 168 F.3d at 1232, and the court is to analyze only those activities identified by the plaintiff. *Id.* at 1231-32. Whether the plaintiff has an impairment within the meaning of the ADA is a question of law for the court to decide. *See Bristol*, 281 F.3d at 1156-57; *Poindexter*, 168 F.3d at 1230. Whether the conduct affected is a major life activity for purposes of the Act is also a legal question for the court. *See Bristol*, 281 F.3d at 1157; *Poindexter*, 168 F.3d at 1230. However, ascertaining whether the impairment substantially limits the major life activity is a factual question for the jury. *See Bristol*, 281 F.3d at 1157.

> Determining both how well 'the average person in the general population' performs any given major life activity and whether the plaintiff has proven he is 'unable to perform' or is 'significantly restricted' in performing a major life activity involves weighing evidence and assessing credibility of witnesses, tasks historically given to the jury in our judicial system.

*Id.* at 1158 (quoting 29 C.F.R. § 1630.2(j)).

In addressing Ms. Doebele's claims under subsection (A), the district court determined that her impairments -- bipolar disorder, ADD, and hypothyroidism -- could constitute disabilities under the ADA.[3] The court viewed Ms. Doebele's pleadings as asserting that her impairments affected the life activities of caring for herself, speaking, sleeping, concentrating, learning, interacting with others, and working for extended periods of time.[4] Although the court noted that in her response to Sprint's motion for summary judgment, Ms. Doebele addressed only the major life activities of communicating, concentrating, and interacting with others, *see Doebele*, 157 F. Supp. 2d at 1208 n.23, the court nonetheless

---

[3] As the district court observed, Sprint has never denied that these impairments could constitute disabilities under the ADA. "[E]very appellate court which has considered the question has held or assumed that 'bipolar disorder' is a mental disability covered under the ADA, at least if it is sufficiently severe, as was the case here." *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1081 (10th Cir. 1997) (citing cases). It is also clear that ADD may constitute an impairment within the meaning of the Act. *See Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998) (citing 29 C.F.R. § 1630.2(h)(2)).

[4] The court held that while working is a major life activity, working overtime is not. *See Doebele*, 157 F. Supp. 2d at 1211. Ms. Doebele does not challenge this ruling on appeal and we do not address it.

addressed whether she had raised a fact issue with respect to the activities of caring for herself, speaking, sleeping, learning, and interacting with others. The court properly rejected concentration as a major life activity, *see Poindexter*, 168 F.3d at 1231 (holding concentration may be component of major life activity but is not such an activity itself), and assumed that interacting with others is a major life activity, *see Steele v. Thiokol Corp.*, 241 F.3d 1248, 1254-55 (10th Cir. 2001) (noting question not resolved in this circuit and not reaching it).

The court then ruled on the third issue, which we held in *Bristol* is ordinarily a fact question for the jury, and concluded as a matter of law that Ms. Doebele had failed to present evidence that her impairments substantially limited any of the major life activities she had identified.[5] Ms. Doebele contends on appeal that in so doing the court improperly evaluated credibility, failed to draw inferences in favor of her as the nonmoving party, and resolved factual disputes. She asserts she raised a fact issue on the basis of Dr. Urdaneta's evidence, her approved short term disability leave on two occasions,[6] and other evidence from

---

[5] As we noted in *Bristol*, in proper circumstances a court may decide this step on a motion for summary judgment. *See Bristol v. Bd. of County Comm'rs*, 281 F.3d 1148, 1161 n.5 (10th Cir. 2002).

[6] Ms. Doebele offers as significant evidence on this issue the statement by Ms. Kinney to her that Sprint was not contesting her disability. This statement, read in context, refers to Sprint's acquiescence in Dr. Urdaneta's decisions regarding placing Ms. Doebele on short term disability leave. The statement is not a concession by Sprint that she was disabled for purposes of the ADA.

Sprint employees tending to show a substantial effect from her disabilities. As we discuss below, our review of the record in the light most favorable to Ms. Doebele persuades us the district court did not err in ruling as a matter of law that she failed to create a fact issue on whether she was disabled under the definition in subsection (A).

A physical or mental impairment is substantially limiting if the affected individual is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999) (quoting 29 C.F.R. § 1630.2(j)(1)). In making this determination we consider three factors: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." *Id.* We also take into consideration "any mitigating or corrective measures utilized by the individual, such as medications." *Id.* at 1305-06. Thus to establish that she was substantially limited in the major life activities she identified, Ms. Doebele was required to show, under the factors set out above, either that she was unable to perform these

-23-

activities or was significantly restricted in her ability to perform them when compared to the average person in the general population.

The district court addressed whether Ms. Doebele was substantially limited in her ability to care for herself, communicate, sleep, learn, and interact with others. Sprint contends on appeal that Ms. Doebele has now abandoned her argument with respect to the activities of caring for herself, sleeping and learning. We believe that Sprint's assessment is a fair reading of Ms. Doebele's appellate argument and Ms. Doebele does not argue to the contrary. Accordingly, we address only the life activities of communicating and interacting with others. In any event, our review of the record establishes that the district court did not err in concluding Ms. Doebele failed as a matter of law to show her impairments affected her ability to care for herself, sleep, or learn.

Ms. Doebele failed to raise a fact issue on whether she was significantly limited in her ability to communicate with others. Other than an instance in which Ms. McCurdy noted that Ms. Doebele had left a phone message in which her speech was slurred and difficult to understand, there is no evidence tending to show she had difficulty communicating. Dr. Urdaneta stated that she had no trouble speaking with him and he had no trouble understanding her. The undisputed evidence shows that Ms. Doebele had conversations with family members, friends, other employees and supervisors. Although her supervisors

believed Ms. Doebele had problems communicating issues and discussing their resolution, they viewed her difficulty as one with the content of the speech and not the speech itself.

Although perhaps a closer question, we conclude the district court also properly determined that Ms. Doebele did not create a fact issue concerning whether her impairments substantially affected her ability to interact with others. We addressed this issue under similar facts in *Steele*, 241 F.3d at 1254-55, noting a circuit split on whether interacting with others is a major life activity for purposes of the ADA and assuming, without deciding, that it was. In *Steele*, as in the instant case, the plaintiff alleged he had severe interpersonal problems with many of his coworkers and his impairments resulted in behaviors that made him the object of nasty comments and jokes. We pointed out, however, that "'[m]ere trouble getting along with coworkers is not sufficient to show a substantial limitation.'" *Id.* at 1255 (quoting *McAlindin v. County of San Diego*, 192 F.3d 1226, 1235 (9th Cir. 1999)). We held dispositive the plaintiff's failure to "provide[] any evidence that his [impairment] has caused him to have trouble getting along with people in general." *Id.* "[I]n order to demonstrate a plaintiff's major life activity of interacting with others was substantially affected, a plaintiff must show that his relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social

withdrawal, or failure to communicate when necessary." *Id.* (internal quotations omitted); *see also Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 499 (10th Cir. 2000).

Here, as in *Steele*, while there is no question Ms. Doebele had difficulty interacting with a number of her coworkers, there is no evidence tending to show she had problems interacting with people in general. The evidence is undisputed that she played softball and volleyball on organized teams, was in a group at work that collected Beanie Babies, babysat, went to Kansas State and Kansas City Chiefs football games, was active in her local college alumni association, and had a boyfriend on and off for a number of years with whom she went to church, the movies and out to dinner. Because Ms. Doebele failed to demonstrate that her impairments substantially impaired her ability to interact with people in general on a regular basis, we conclude that, even assuming interacting with others is a major life activity, Ms. Doebele has not shown this activity was significantly limited for purposes of the ADA.

**2. Record of Disability**

Ms. Doebele also contends she meets the definition of disability under section 12102(2)(B) because she has a record of an impairment that substantially limits the major life activity of working.[7] "To have a record of such an

---

[7] As the district court pointed out, *see Doebele*, 157 F. Supp. 2d at 1213 n.26, Ms. Doebele is not taking inconsistent positions in asserting this claim. Her

(continued...)

impairment, a plaintiff must have a history of, or been misclassified as having, an impairment that substantially limited a major life activity." *Sorensen v. Univ. of Utah Hosp.*, 194 F.3d 1084, 1087 (10th Cir. 1999). "[T]he record-of-impairment standard is satisfied only if she actually suffered [an impairment] that substantially limited one or more of her major life activities." *Id.* (quoting *Hilburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999)). Ms. Doebele asserts she satisfies this definition on the basis of her short term disability leaves, contending they constitute a record showing that her mental impairments substantially limited her ability to work.

We assess this claim by considering the nature and severity of the impairment, its duration or expected duration, and the permanent or long term impact or expected impact resulting from the impairment. *Id.* The nature and severity of Ms. Doebele's mental impairments during her disability leaves clearly weigh in favor of finding that they substantially impaired her ability to work. However, the periods themselves were of limited duration and thus weigh against a finding of substantial limitation. *See id.* Moreover, at the time these events occurred, both Dr. Urdaneta and Ms. Doebele believed that she could work under

[7](...continued)
claim under 42 U.S.C. § 12102(2)(A) asserting that her impairments limited major life activities did not include the activity of working, while her claims under subsections (B) and (C) are based only on the major life activity of working.

-27-

the limitations Dr. Urdaneta suggested.[8]  The expected duration of the

impairments thus also weighs against a finding of disability.  Accordingly, we

conclude that Ms. Doebele has not raised a fact issue on whether she had a record

of a disability under subsection (B) during the relevant period.

### 3. Regarded as Disabled

Finally, we turn to Ms. Doebele's claim that she is disabled under section

12102(2)(C) because Sprint personnel regarded her as having an impairment that

substantially limited the major life activity of working.

> There are two apparent ways in which individuals may fall within
> this statutory definition: (1) a covered entity mistakenly believes that
> a person has a physical impairment that substantially limits one or
> more major life activities, or (2) a covered entity mistakenly believes
> that an actual, nonlimiting impairment substantially limits one or
> more major life activities.  In both cases, it is necessary that a
> covered entity entertain misperceptions about the individual–it must
> believe either that one has a substantially limiting impairment that
> one does not have or that one has a substantially limiting impairment
> when, in fact, the impairment is not so limiting.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).

---

[8] The record contains evidence from a vocational expert that the restrictions placed by Dr. Urdaneta on Ms. Doebele's ability to work after her second disability leave would not prevent her from working as an accountant.  Moreover, Dr. Urdaneta stated that "[p]art of me has seen her as still capable of doing work. On the other hand, I had become more and more aware that she had limitations." Aplt. App., vol. II at 576.  He encouraged her to begin thinking about rehabilitation and returning to work, but could not say with a reasonable degree of medical certainty whether she was capable of working.  All of this evidence, however, addressed Ms. Doebele's limitations well after the events upon which her claims are based.

"These misperceptions often 'resul[t] from stereotypic assumptions not truly indicative of . . . individual ability." *Id.* (quoting 42 U.S.C. § 12101(a)(7)). "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *Id.* (quoting *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 284 (1987)).

> An individual rejected from a job because of the "myths, fears and stereotypes" associated with disabilities would be covered under this part of the definition of disability, whether or not the employer's or other covered entity's perception were shared by others in the field and whether or not the individual's actual physical or mental condition would be considered a disability under the first or second part of this definition. As the legislative history notes, sociologists have identified common attitudinal barriers that frequently result in employers excluding individuals with disabilities. These include concerns regarding productivity, safety, insurance, liability, attendance, cost of accommodation and accessibility, workers' compensation costs, and acceptance by coworkers and customers.

29 C.F.R. pt. 1630, App. § 1630.2(*l*).

When the major life activity at issue is that of working, a plaintiff must show that she is unable to perform either a class of jobs or a broad range of jobs in various classes. *See Sutton*, 527 U.S. at 491-92 (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)(3)(i)). A plaintiff asserting she is disabled under subsection (C) must therefore show that her employer regarded her as having an impairment substantially limiting her ability to perform a broad range of jobs, rather than a single position, *see id.* at 491-92; *McKenzie v. Dovala*, 242 F.3d 967, 970-72

(10th Cir. 2001); *Sorensen*, 194 F.3d at 1088-89, and that the employer's misperception was "based on 'myth, fear, or stereotype,' including concerns regarding safety, insurance, liability, and acceptance by coworkers and the public." *McKenzie*, 242 F.3d at 971.

Our review of the record convinces us Ms. Doebele presented a fact issue on whether Sprint's adverse employment actions were motivated by the fact that her supervisors regarded her as substantially limited from a broad class of jobs by her mental impairments. Her coworkers and supervisors knew she had mental problems even before she was diagnosed as bipolar by Dr. Urdaneta. Although Ms. McCurdy originally believed Ms. Fluke had orchestrated the alleged workplace fear that Ms. Doebele posed a physical threat to coworkers, the evidence set out above indicates that Ms. McCurdy and Ms. Carson both came to view Ms. Doebele as a threat to other employees after Ms. Doebele was diagnosed and had taken disability leave. In this regard, we note the memo sent from Linda Weidner to Ms. McCurdy in October 1998 cautioning Ms. McCurdy that she could be viewed as having "lost all objectivity" with respect to Ms. Doebele. Aplt. App., vol. II at 590. We also note, in particular, statements by Ms. McCurdy and Ms. Carson to Ms. Dillard voicing their belief that Ms. Doebele posed a physical threat and their decision to have security personnel present when she was given her final warning and when she was fired. In addition to their admitted concern

about her relationship with coworkers, the record reveals that Ms. Doebele's

supervisors also expressed concern with productivity, attendance and insurance,

all recognized indicators of discrimination based on myth, fears, and stereotypes.

*See* 29 C.F.R. pt. 1630, App. § 1630.2(*l*); *McKenzie*, 242 F.3d at 970-71.

It is significant that the ADA anti-discrimination provision "does not

contemplate a stark dichotomy between 'disability' and 'disability-caused

misconduct,' but rather protects both." *McKenzie*, 242 F.3d at 974 (quoting

*Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 (10th Cir. 1998)); *see also Den*

*Hartog*, 129 F.3d at 1088. The ADA thus protects an individual from "adverse

employment action based on conduct related to her illness so long as she does not

pose a 'direct threat.'" *McKenzie*, 242 F.3d at 974 (citing 42 U.S.C. § 12113(a),

(b)).

> The determination that an individual is unqualified because she poses
> a direct threat must be "based on an individualized assessment of the
> individual's present ability to safely perform the essential functions
> of the job," which in turn must be based on "a reasonable medical
> judgment that relies on the most current medical knowledge and/or
> on the best available objective evidence."

*Id.* (quoting 29 C.F.R. § 1630.2(r)).[9] The record provides no indication Ms.

---

9      [T]he ADA's protection of disability-caused conduct is
subject to certain limitations found in the Act. First, a
disabled employee "may be held to any performance
criteria that are job-related and consistent with business
necessity, so long as the disabled employee is given the

(continued...)

McCurdy's and Ms. Carson's belief that Ms. Doebele posed a physical threat to coworkers was based on a reasonable medical judgment. None of Dr. Urdaneta's reports indicated she posed a threat to her coworkers, and he eventually cleared her to return to work with recommended accommodations to help ease her back into a full work schedule. The supervisors' disregard of the assessment and recommendations of Ms. Doebele's treating physician support the inference that their actions were improperly based on myth, fear, and stereotype, rather than an individualized evaluation of Ms. Doebele's abilities.

The record also supports the reasonable inference that Ms. Doebele's supervisors viewed her as substantially limited in her ability to perform a broad range of jobs. Although Ms. McCurdy and Ms. Carson rejected most of Dr.

---

[9](...continued)
> opportunity to meet such performance criteria by reasonable accommodation." Second, an employer need only make reasonable accommodation, and need not make any accommodation that would constitute an "undue hardship." Third, an employer may take action against an employee who poses a "direct threat" to the health or safety of other individuals in the workplace.

*Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 608 (10th Cir. 1998) (internal citations and quotations omitted). We discuss the third limitation here only as it relates to the reasonable inference that Ms. Doebele's supervisors regarded her as disabled due to her impairment-related conduct. Because the district court determined that Ms. Doebele had failed to raise a fact issue on whether she was disabled under the "regarded as" definition, the court did not address the issues of reasonable accommodation and undue hardship and those matters are not at issue in this appeal.

Urdaneta's requested accommodations, they did not consider offering Ms. Doebele another position at Sprint in which Dr. Urdaneta's recommendations could be implemented, even though Sprint was hiring 200-300 people a week at the time. A fact finder could infer that Ms. Doebele's supervisors believed she was precluded from working in a broad class of positions due to their misperception that she posed a threat to coworkers as a result of her mental illness. We cannot agree with the district court's conclusion that Ms. Doebele's "evidence on this point is virtually non-existent." *Doebele*, 157 F. Supp. at 1213. Rather, we agree with Ms. Doebele that in granting summary judgment for Sprint on this claim the district court simply did not view the evidence in the light most favorable to Ms. Doebele, or draw reasonable inferences in her favor.

In sum, we conclude that Ms. Doebele has raised a fact issue as to whether her supervisors discriminated against her by regarding her as unable to perform the activity of working due to her mental impairments. Accordingly, we reverse the grant of summary judgment for Sprint on this claim and remand for further proceedings.

**B. Retaliation under the ADA and the FMLA**

Ms. Doebele contends Sprint fired her in retaliation for exercising the rights provided her under the ADA and the FMLA. Both statutes expressly prohibit retaliation against individuals who make charges under or otherwise

exercise rights granted by their provisions.  *See* 42 U.S.C. § 12203 (ADA); 29

U.S.C. § 2615 (FMLA).  We address these claims under the analytical framework

applicable to Title VII, as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802-04 (1973).  *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.

1997).

> As with discrimination claims, once the plaintiff has established a
> prima facie case of retaliation, the employer has the burden of
> coming forth with a legitimate, nondiscriminatory reason for its
> adverse action.  If the employer does so, the plaintiff may then
> present evidence that the reason given by the employer is a mere
> pretext for the real, discriminatory reason for the adverse action.

*Butler v. City of Prairie Village*, 172 F.3d 736, 752 (10th Cir. 1999) (citations

omitted).

"To establish a prima facie case of reprisal, a plaintiff must show (1)

protected employee action; (2) adverse action by an employer either after or

contemporaneous with the employee's protected action; and (3) a causal

connection between the employee's action and the employer's adverse action."

*Morgan*, 108 F.3d at 1324.  Once a prima facie case is shown, the employer has

the burden of producing evidence of a nondiscriminatory reason for its action.

"This burden is one of production, not persuasion; it can involve no credibility

assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142

(2000) (internal quotation omitted).  "[T]he plaintiff – once the employer

produces sufficient evidence to support a nondiscriminatory explanation for its

-34-

decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 143 (internal quotation omitted).

In *Reeves*, the Supreme Court addressed the nature of the pretext evidence a plaintiff must produce to withstand summary judgment once she shows a prima facie case and the defendant has produced evidence of a legitimate nondiscriminatory reason for the adverse action. The Court held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. Under *Reeves*, therefore, a plaintiff's prima facie case, plus evidence that the defendant's reasons for the adverse action were pretextual, may be adequate to defeat a motion for summary judgment. The plaintiff need not show both that the defendant's reasons were a pretext *and* that the real reason was discrimination – the fact of pretext alone may allow the inference of discrimination. *Id.* at 146-49.

In this case, the district court ruled that Ms. Doebele had presented a prima facie case,[10] and that Sprint had articulated poor attendance and inappropriate

---

[10] The district court concluded Ms. Doebele had stated a prima facie case on her claim that Sprint retaliated against her for her use of leave under the

(continued...)

behavior as legitimate business reasons for its decision to terminate her.   The

court concluded that Ms. Doebele failed to raise a fact issue on pretext, holding

that

> the record compels an inference that even if [her supervisors] were
> out to get plaintiff, it was because she was an intractable
> management problem (i.e. as defendants claim, she had serious
> interpersonal problems with both supervisors and fellow employees)
> and not because she exercised her rights to take FMLA leave.

*Doebele*, 157 F. Supp. 2d at 1218.  The court likewise concluded that even though

the record supported an inference of pretext, "it contains no evidence – aside from

the timing of events – that their agenda was a pretext for unlawful retaliation

under the ADA." *Id.* at 1220.  The court thus ruled that although Ms. Doebele

had shown a prima facie case and had presented evidence of pretext, summary

judgment for Sprint was nonetheless proper because she had failed to show the

reasons given were a pretext for unlawful retaliation.

On appeal, Ms. Doebele contends the district court erred on two grounds.

---

[10](...continued)
FMLA, *Doebele*, 157 F. Supp.2d at 1216, but ruled she had stated a prima facie
case under the ADA only with respect to her request for accommodations and not
with respect to her claim based on the written complaint she sent to Ms. Dillard.
*Id.* at 1219-20.  Ms. Doebele does not challenge this ruling on appeal.  Sprint
asserts on appeal in a footnote that it believes Ms. Doebele did not present
sufficient evidence to show a prima facie case on any of her retaliation claims.
Sprint does not present argument and authority on this issue and we therefore
deem it abandoned.  *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d
1152, 1175 (10th Cir. 2002), *modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003).

First, she maintains she presented direct evidence of retaliatory motive and that summary judgment was therefore improper. Second, she contends the district court's rulings on the retaliation claims were contrary to the Supreme Court's decision in *Reeves.* In its grant of summary judgment, the district court did not cite to *Reeves* or evaluate the evidence under its holding. Although the court recognized that the evidence, viewed most favorably to Ms. Doebele, tended to show the reasons offered by Sprint were a "sham," the court nonetheless granted summary judgment for Sprint because Ms. Doebele had not presented sufficient evidence that the real reason was discrimination. *Reeves* holds, to the contrary, that a jury may draw an inference of discrimination from evidence of a prima facie case and pretext alone. *Reeves* 530 U.S. at 146-49. *See also Townsend v. Lumbermens Mut. Cas. Co.*, 294 F.3d 1232, 1239-40 (10th Cir. 2002); *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir. 2000); *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).

The district court revisited the issue in its post-judgment ruling, addressing the holding in *Reeves* and concluding nevertheless that summary judgment for Sprint was proper. The court stated:

> Under *Reeves*, plaintiff may not overcome summary judgment if the "record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." While defendants may not have

-37-

conclusively established a nondiscriminatory reason for their decision, plaintiff did not adequately satisfy her burden under *McDonnell Douglas*.

*Doebele*, 168 F. Supp. 2d at 1265 (quoting *Reeves*, 530 U.S. at 148).

In so holding, the court discounted Ms. Dillard's testimony that other employees with worse attendance problems were not disciplined, observing that Ms. Doebele had not shown those employees were similarly situated or that employees with behavioral problems and attendance problems were not disciplined. *See id.* Ultimately, the court held that "plaintiff failed to show that defendant's offered reasons for her termination were false or unworthy of belief." *Id.* at 1266. We disagree. The district court evaluated the evidence under an erroneous view of the applicable legal standards, and failed to view the record most favorably to Ms. Doebele or to draw reasonable inferences from the evidence in her favor. When examined under the proper standards, the record clearly is sufficient to raise a fact issue as to whether Sprint's reasons for firing Ms. Doebele were pretextual and, significantly, does not contain the requisite "abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148.

We first point out the court erred in ruling that a plaintiff must show she was treated differently from other similarly situated employees to survive summary judgment. "Significantly, '[t]he evidence which [a plaintiff] can present

-38-

in an attempt to establish that [a defendant's] stated reasons are pretextual may take a variety of forms. . . . [A plaintiff] may not be forced to pursue any particular means of demonstrating that [a defendant's] stated reasons are pretextual.'" *Kendrick v. Penske Trans. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 187-88 (1989)). As the above authority makes clear, pretext may be shown by a variety of evidence and no one type of evidence is required. It is true that a plaintiff who attempts to show pretext with evidence that the defendant acted contrary to company practice when making the adverse employment decision may often do so with evidence that she was treated differently from other similarly situated employees. *Id.* It is also true that the failure to present probative evidence that the plaintiff was in fact treated differently than those similarly situated may permit the grant of summary judgment. *Id.* at 1232-34. However, this assessment must be made by adding up the differences and similarities in light of all the evidence of pretext to determine whether a plaintiff has created a fact issue on the matter of pretext. *Id.* at 1234.

The record in this case contains both direct evidence of retaliatory motive and circumstantial evidence tending to show pretext. As direct evidence, Ms. Doebele points to Ms. Dillard's testimony that Ms. Doebele's supervisors complained that due to her absences, most of which constituted valid FMLA

leave, her workload had to be distributed among other employees. Ms. McCurdy sent an email to Ms. Carson addressing Dr. Urdaneta's recommendation in November 1998 that Ms. Doebele not work more than forty hours a week, describing the recommendation as "ridiculous" and as an attempt by Ms. Doebele to build "a reason to go on long-term disability." Aplt. App., vol. II at 422. The record also contains an email from human resources personnel describing as "unfortunate" the fact that Ms. Doebele had timely requested a continuation of her disability leave under the FMLA. Finally, in an email to her supervisor informing him of Ms. Doebele's upcoming final written warning, Ms. Carson pointed out that Ms. Doebele had been on disability leave for over nine weeks.

In addition, when viewed most favorably to Ms. Doebele, the record contains ample evidence that Sprint's proffered reasons for its adverse employment actions were pretextual. It is undisputed that although her supervisors based Ms. Doebele's discharge in part on her attendance problems, much of her time off was taken pursuant to the FMLA and, in addition, at the time she was fired it is undisputed that she still had time pool days available. Ms. Dillard believed Ms. Doebele's supervisors were purposely overloading her with work, thus permitting the inference that they were deliberately adding to her work-related stress in an attempt to get rid of her. Moreover, Ms. Doebele presented evidence that the documentation for the written warning she received in

July 1998 was the product of procedural irregularities which Ms. Dillard viewed as disturbing.[11]  Ms. Dillard testified that the incidents upon which the warning was based were not documented for many weeks and then only at her urging.  She stated that in her view the resulting paperwork was created in an attempt to justify a decision already made.  Ms. Dillard also testified that Ms. Doebele was treated differently from other employees with mental problems, and that in similar situations managers followed the guidance provided by the human resources department to ensure they were not treating employees unlawfully and were acting in the best interests of the employee and the company.[12]  In this case, contrary to the usual practice, Ms. Doebele's supervisors not only disregarded the counsel provided by Ms. Dillard, but they also complained to Ms. Dillard's supervisor who then took over Ms. Doebele's file.  Ms. Dillard testified that by the time her

---

[11] This court recognizes that "disturbing procedural irregularities," including "deviations from normal company procedure," provide support for a plaintiff's assertion of pretext. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1219-20 (10th Cir. 2002) (quoting *Mohammed v. Callaway*, 698 F.2d 395, 401 (10th Cir. 1983)).

[12] Given Ms. Dillard's perspective on company-wide practices due to her position as EEO compliance officer in the human resources department, we cannot say her evidence on this issue is without probative value despite the generalized nature of her observations. *See Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1178-80 (10th Cir. 2001) (affiant's position as instructor provided opportunity to observe first hand school's allegedly discriminatory policies and practices).  We also note that in posing this question, counsel for Ms. Doebele asked Ms. Dillard not to name names, presumably in order to protect the privacy of those employees who had been counseled for claims of mental impairments.  *See* Aplt. App., vol. II at 544.

deposition was taken, her notes on Ms. Doebele's case were missing. Finally, after Ms. Dillard expressed her concern to Ms. Doebele's supervisors that they had not given her "a fair opportunity for her to demonstrate her ability to improve her performance which is required under [Sprint] policy," they responded they understood the risk that their conduct could produce a complaint of discrimination or harassment and that "we're going to follow the steps that we're required to follow, meaning we are going to gather the proper data, the proper documentation, and we're going to manage her performance but we are going to be on her all the time." Aplt. App., vol. II at 542-43. This evidence permits a reasonable inference that Ms. Doebele's supervisors acted with an ulterior motive and had engineered and manufactured the reasons they proffered for terminating her employment. In so holding, we emphasize that at the summary judgment stage "all doubts concerning pretext must be resolved in plaintiff's favor." *Morgan*, 108 F.3d at 1324.

Accordingly, we conclude Ms. Doebele has presented sufficient evidence to raise a fact issue for the jury on her claim that Sprint discharged her in retaliation for the exercise of her rights under the ADA and the FMLA. Summary judgment for Sprint on these claims is reversed and the case is remanded for further

proceedings.[13]

## C. Retaliation under State Law

Ms. Doebele also asserts a claim for retaliatory discharge under state law, contending that Sprint fired her in anticipation that she would file a workers' compensation claim. The district court granted summary judgment for Sprint on this claim, reasoning that because mental injuries are not compensable under the Kansas workers' compensation statute absent physical injury, Ms. Doebele's

---

[13] Ms. Doebele also challenges the district court's denial of her motion to file a surreply to Sprint's reply brief to which Sprint attached new evidentiary material relevant to the issue of pretext. Ms. Doebele contends the district court improperly relied on the new material in violation of *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159 (10th Cir. 1998), and that she was prejudiced by the court's consideration of this evidence.

In *Beaird*, we held that "[h]aving accepted the reply brief, the district court in fact had two permissible courses of action. It could either have permitted a surreply or, in granting summary judgment for the movant, it could have refrained from relying on any new material contained in the reply brief." *Id.* at 1164. We pointed out that "Rule 56(c) requires the nonmoving party to be given notice and a reasonable opportunity to respond to the movant's summary judgment materials." *Id.* "Rule 56(c) simply requires that if the court relies on new materials *or* new arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials." *Id.* at 1165 (emphasis added). The district court incorrectly distinguished *Beaird* on the ground that it applied only to new legal arguments supported by new materials while here, the new material supported legal arguments already made. Rather, *Beaird* speaks in terms of either new legal arguments or new material. Therefore, in accordance with *Beaird*, we conclude the court abused its discretion to the extent it relied on new evidentiary materials presented for the first time in Sprint's reply brief. *Id.* at 1164. However, in view of our reversal of the grant of summary judgment on her claims of pretext, we need not address whether Ms. Doebele was prejudiced. Any prejudice flowing from her inability to reply to this material may be corrected on remand.

retaliation claim was barred. *See Doebele*, 157 F. Supp. 2d at 1222.[14] Ms.

Doebele argues on appeal that she is not claiming Sprint retaliated because she

had *filed* a workers' compensation claim, but that Sprint retaliated *in anticipation*

of her filing such a claim. Ms. Doebele contends that under Kansas law, a court

is to look at the intent of the employer at the time the termination decision is

made, and that the evidence is sufficient to create a fact issue concerning whether

her supervisors' decision was motivated by their fear that she would file in the

future. However, Ms. Doebele does not address in either her opening or reply

brief the district court's ruling that absent physical injury, mental injuries are not

compensable under the Kansas workers' compensation statute so her state

retaliation claim lacks merit.

In analyzing retaliatory discharge cases under the Kansas workers'

compensation statute, the Kansas courts have adopted the burden-shifting

framework originally set out in *McDonnell Douglas Corp.*, as applied to federal

employment discrimination and retaliation claims. *See Foster v. AlliedSignal

Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002); *Sanjuan v. IBP, Inc.*, 275 F.3d 1290,

1294 (10th Cir. 2002) (citing *Rebarchek v. Farmers Coop. Elevator & Mercantile

Ass'n*, 35 P.3d 892, 898 (Kan. 2001) (*Sanjuan II*). Under this familiar scheme, a

---

[14] It is clear that under the Kansas workers compensation scheme, mental
disorders are not compensable absent physical injury. *See Followill v. Emerson
Elec. Co.*, 674 P.2d 1050 (Kan. 1984).

plaintiff has the initial burden of making a prima facie case. *See Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998) (*Sanjuan I*).

In meeting this initial burden, the plaintiff must show, in part, that she sustained an injury for which she could or might assert a future claim for benefits. *Compare Sanjuan I*, 160 F.3d at 1298 (articulating standard as sustaining injury for which one *might* assert future claim of benefits), *and Mackey v. IBP, Inc.*, 167 F.R.D. 186, 194 (D. Kan. 1996) (same), *with Robinson v. Wilson Concrete Co.*, 913 F. Supp. 1476, 1483 (D. Kan. 1996) (standard stated as sustaining injury for which one *could* assert future claim of benefits), *and Bracken v. Dixon Indus. Inc.*, 38 P.3d 679, 682 (Kan. 2002) (same). *See also Crumpacker v. Kansas*, 2003 WL 21872550 at *6 (10th Cir. 2003) (retaliation claim cannot be based on unreasonable good-faith belief that underlying conduct violated Title VII). Because Ms. Doebele did not pose any challenge to the district court's conclusion that she failed to state a prima facie case for retaliatory discharge based on her inability to show she was entitled to file a workers' compensation claim, we deem this matter waived. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (failure to raise issue in appellate briefs constitutes waiver). Consequently, we affirm the district court's grant of summary judgment to Sprint on this issue.

The judgment of the district court is **AFFIRMED** in part, and **REVERSED**

in part, and the case is **REMANDED** for further proceedings in light of this opinion.