**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 5 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JUDITH A. HILL,

        Plaintiff-Appellant,

v.

STEVEN MOTORS, INC., also
known as Steven Motor Group,

        Defendant-Appellee.

No. 02-3415
(D.C. No. 00-CV-1362-JTM)
(D. Kan.)

---

**ORDER AND JUDGMENT** *

---

Before **MURPHY** , **HARTZ** , and **McCONNELL** , Circuit Judges.

---

Plaintiff Judith Hill sued her former employer, Steven Motors, Inc.,

alleging employment discrimination. The district court granted Steven Motors

summary judgment on all claims. Plaintiff appeals that court's adverse judgments

on her claims under the Age Discrimination in Employment Act (ADEA),

---

\* After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel. The court generally disfavors the citation of orders and
judgments; nevertheless, an order and judgment may be cited under the terms and
conditions of 10th Cir. R. 36.3.

29 U.S.C. §§ 621-34; Title VII of the Civil Rights Act (Title VII), 42 U.S.C. §§ 2000e through 2000e-17; and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213. The district court also granted Steven Motors summary judgment on Plaintiff's claims under the Family Medical Leave Act, the Equal Pay Act, the Kansas Act Against Discrimination, and the Kansas Age Discrimination in Employment Act; but Plaintiff does not challenge those rulings on appeal. Our jurisdiction arises under 28 U.S.C. § 1291. We affirm the judgment below.

## I.    Background

Whether Steven Motors was entitled to summary judgment is a question of law we review de novo. *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, "[a]ll inferences arising from the record before us must be drawn and indulged in favor of the [nonmovant]." *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003) (internal quotation marks omitted). "Credibility determinations [and] the weighing of the evidence . . . are jury functions, not those of a judge." *Id.* at 1216 (internal quotation marks omitted).

-2-

Nevertheless, "the nonmovant must establish, at a minimum, 'an inference of the existence of each element essential to [her] case.'" *Croy*, 345 F.3d at 1201 (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). Accordingly, we will set forth Plaintiff's version of the facts and undisputed evidence proffered by Steven Motors.

The events relevant to this appeal began in 1996, two years after Steven Motors recruited Plaintiff from a competing car dealership. At that time Steven Motors, which is owned by Mike Steven, had just leased property in west Wichita with the hope it would thereafter acquire a dealer franchise for the site. This site was known as the West Wichita Auto Center or WWAC. On September 2, 1996, Steven Motors promoted Plaintiff, then fifty-one, to General Manager of the WWAC.

Steven Motors provided the WWAC inadequate resources throughout Plaintiff's tenure. In January 1999 Plaintiff threatened to quit if Harold Johnson, Steven Motors' CEO, did not provide her an advertising budget, the inventory she needed, and a proper service aisle. In response, Mr. Johnson encouraged Plaintiff not to "throw [in] the towel," and told her "[w]e still don't know what we are going to do out there . . . but you are doing a good job with what you have to work with." Aplt. App., Vol. 1 at 144.

In 1999 Mr. Johnson tried to convince Mr. Steven to close the WWAC because of its unprofitability. At the same time, however, Mr. Steven and Mr. Johnson were in the thick of negotiations with Pam Bjork, owner of Don Schmid Dodge, to relocate her franchise to the WWAC site.

On July 11, 1999, Plaintiff suffered a stroke. As a result, she was unable to work for five months. Shortly after her stroke, Plaintiff spoke with Mr. Johnson on the telephone and lamented that she could not use her right arm. Mr. Johnson replied, "You know, Judy, after all, you have worked the old body pretty hard, and maybe you should do something less stressful." *Id.* at 146. In that same conversation Mr. Johnson said, "Judy, I think we can just find something different for you to do. . . . After all . . . we are going to be making some changes out [at the WWAC]." *Id.* at 147.

During Plaintiff's absence, Mr. Steven, Mr. Johnson, and Ms. Bjork completed their negotiations. The parties verbally agreed that Elden Hull, who was then the General Manager of Don Schmid Dodge, would remain General Manager after Don Schmid relocated to west Wichita and replaced the WWAC. On August 30, 1999, the Steven-Johnson Management Group, LLC (composed of Mr. Steven and Mr. Johnson), Don Schmid Motor, Inc., and Ms. Bjork, entered into a management agreement. Under the agreement Ms. Bjork maintained

ownership of Don Schmid, but the Steven-Johnson Management Group was responsible for running the franchise.

On September 13, 1999, Mr. Johnson told Plaintiff in a telephone conversation that she would not be able to return to her General Manager position even if she were able to work full time. Three days later she wrote to Mr. Johnson expressing her belief that she would have her job back if she were younger or male. Mr. Johnson replied in writing, detailing the financial difficulties the WWAC had experienced. He said that Steven Motors had contemplated closing the WWAC, but that before doing so "began talking with Don Schmid Dodge about relocating to [the WWAC]." *Id.*, Vol. 3 at 603. Mr. Johnson also disputed Plaintiff's version of their telephone conversation, asserting: "[W]hat I actually said was at this time we do not have any General Manager positions available for you[,]" not "that you could not return as General Manager even if you could work full time." *Id.* Plaintiff's attorney then intervened and on October 22, 1999, wrote Mr. Johnson a letter warning him that Plaintiff was preparing to file a discrimination charge against Steven Motors. The letter also declared that in December Plaintiff would return to her position as General Manager of the WWAC. On November 30, 1999, while still on medical leave, Plaintiff filed with the Kansas Human Rights Commission an employment discrimination claim alleging age and sex discrimination.

When Plaintiff's doctor released her to go back to work, he restricted her to no more than forty hours per week or eight hours a day. On December 12, 1999, Plaintiff returned to the WWAC, which had by this time begun operating as Don Schmid Dodge. Within a week Steven Motors moved Plaintiff to one of its other dealerships to work as a Fleet and Leasing Manager. In this position Plaintiff's base salary guarantee was $3,000 per month, which was $1,000 less than it had been when she was General Manager of the WWAC.

Plaintiff asserts that in retaliation for her various complaints while she was a Fleet and Leasing Manager, Steven Motors repeatedly interfered with her ability to do her job. John Scott, a former Steven Motors Buick sales manager, stated in an affidavit that although he could not recall the "exact words" of his supervisor, General Manager Christine Enquist, he "specifically recall[ed] that she said that she wanted to make things miserable for [Plaintiff]." Aplt. App., Vol. 4 at 984. And, on March 6, 2000, Mr. Johnson told Plaintiff that she would "be sorry" if she pursued her "lawsuit." *Id.* at 1013.

Plaintiff thereafter amended her administrative complaint, adding disability-discrimination and retaliation claims. The Equal Employment Opportunity Commission issued Plaintiff a notice of right to sue on June 13, 2000. She filed this lawsuit on September 1, 2000.

In January 2001 Steven Motors promoted Plaintiff to a Finance and Insurance (F&I) Manager position at Don Schmid Dodge. In so doing, Steven Motors verbally guaranteed her a monthly base salary of $3,500 for six months, although she was actually paid a guaranteed monthly base salary of $4,000 during that period. At this time Dean Harris was the other Don Schmid Dodge F&I Manager.

During July 2001, Don Schmid's General Manager, Gary Shaffer, heard rumors that Mr. Harris was going to resign, and Mr. Harris heard rumors he was going to be fired. Mr. Shaffer investigated and decided that Plaintiff was the source of the rumors. Plaintiff maintains "[n]either rumor was true." Aplt. Br. at 22. She also insists that she never told Mr. Harris that he was going to be fired, and contends that his affidavit (which post-dates Plaintiff's termination) confirms her assertion. *See* Aplt. App., Vol. 4 at 825 ("[Plaintiff] never told me that I [Harris] was going to be fired."). But Plaintiff admits that Mr. Harris "told [her] he was going to quit," and that she relayed this news to Mr. Shaffer before Mr. Harris told Mr. Shaffer. Aplt. Br. at 22. More importantly, in a transcribed telephone conversation between Mr. Harris and Mr. Johnson before Plaintiff's termination (and over a year before Mr. Harris's affidavit), Mr. Harris made clear his consternation with Plaintiff and stated that Plaintiff had told co-workers that

-7-

he planned to quit, had lied to him about making such statements, and had told him he was being fired.

Plaintiff was deposed for this lawsuit on July 11, 2001. On July 20, 2001, Plaintiff wrote Mr. Shaffer to complain about the removal of her six-month base-salary guarantee (six months after it was instated), Mr. Shaffer's comment that she should "just quit" if she was not happy, the award of bonuses, and problems with scheduling. Aplt. App., Vol. 3 at 654-55. In this letter Plaintiff asserted that these acts were in retaliation for her pending lawsuit. Mr. Shaffer fired Plaintiff on July 23, 2001.

On October 22, 2002, the district court granted Steven Motors summary judgment on all Plaintiff's claims. Plaintiff appeals that court's adverse judgments on her claims under the ADEA, Title VII, and the ADA.

## II.     Allocation of Burdens of Production and Proof

When a plaintiff relies on circumstantial evidence to demonstrate employment discrimination, we apply the three-step burden-shifting framework set forth in *McDonnell Douglas* and its progeny. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-07 (1973); *Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002) (*McDonnell Douglas* applies to ADEA and Title VII claims); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003) (*McDonnell Douglas* applies to ADA claims). We likewise apply the *McDonnell*

*Douglas* framework to retaliation claims. *See Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003).

*McDonnell Douglas* first requires Plaintiff to establish a prima facie case of prohibited employment action. The "burden of establishing a prima facie case . . . by a preponderance of the evidence" is "not onerous." *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001) (internal quotation marks omitted). Once Plaintiff makes a prima facie showing, the burden shifts to Steven Motors to state a legitimate, "nondiscriminatory reason" for its "adverse employment action." *Wells*, 325 F.3d at 1212. If Steven Motors meets this burden, then summary judgment is warranted unless Plaintiff can show that there is a genuine issue of material fact as to whether the proffered reasons are pretextual. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 756 (10th Cir. 2000).

### III. Disparate-Treatment Claims under the ADEA and Title VII

Under the ADEA and Title VII it is unlawful for an employer "to fail or refuse to hire," to "discharge," "or to otherwise discriminate against any" employee with respect to the employee's "compensation, terms, conditions, or privileges of employment," because of the employee's protected status. 29 U.S.C. § 623(a); 42 U.S.C. § 2000e-2(a). As part of an employee's prima facie case of discrimination, she must demonstrate that she suffered an adverse employment action. *See Jones*, 203 F.3d at 753. Plaintiff maintains that she was subjected to

two such adverse actions on the basis of her age and sex: (1) Steven Motors did not return her to the position of General Manager of the WWAC after her stroke, and (2) Steven Motors terminated her employment.

## A. The General Manager Position

Plaintiff claims that if she were younger or male, Steven Motors would have returned her to the position of General Manager of the WWAC after her stroke. We need not address whether Plaintiff made a prima facie case of discrimination. We proceed to the second and third steps of the *McDonnell Douglas* burden-shifting framework, considering Steven Motors' proffered reasons for not placing Plaintiff in the General Manager position, and evaluating whether Plaintiff can show that these reasons were pretextual.

Steven Motors contends that it did not place Plaintiff in the General Manager position upon her return to work because she was not qualified for the position. Among its alleged reasons for finding her not qualified was that her doctor's forty-hour-per-week restriction would not let her spend sufficient time at the job. Mr. Johnson testified that General Managers generally need to work fifty to sixty hours per week "and usually more. They also typically work six days per week." Aplt. App., Vol. 5 at 1139. Indeed, Plaintiff acknowledges that she usually worked seventy hours per week as General Manager. She claims, however, that her long hours were only "when she did not have adequate help at

the WWAC." Aplt. Br. at 39 (emphasis deleted). She goes on to insist that she could have performed the duties of General Manager within her doctor's restrictions, asserting that one of her "younger counterpart[s]," Ms. Enquist, "did not work anywhere near 50-70 hours per week as [General Manager]" of one of Steven Motors' other dealerships. *Id.* at 40. Her sole support for this assertion is the affidavit of Mr. Scott, which states that he "observed that [Ms. Enquist] typically would start the day around 11:00 a.m., go to lunch for several hours, and leave early." Aplt. App., Vol. 4 at 985.

Yet even if one credits Mr. Scott's observations, Plaintiff fails to produce evidence that Ms. Enquist's superiors were aware of her limited hours. Nor has Plaintiff produced any other evidence that senior management did not sincerely believe that the job of General Manager required working significantly more than forty hours per week.

Hence, Plaintiff has failed to create a genuine issue of fact regarding pretext on this issue. We therefore affirm the district court's dismissal of Plaintiff's claim that she was denied rehiring as General Manager because of age or gender discrimination.

### B.    Plaintiff's Termination

Plaintiff alleges that Steven Motors fired her because of her age and sex. The district court stated that Steven Motors had "an honest belief that its actions

were justified to advance its business interests. . . . [and that] Plaintiff's age and gender discrimination claims were not supported by the evidence." *Id.*, Vol. 5 at 1224.

Once again, we need address only the pretext issue. Mr. Shaffer testified that he fired Plaintiff because

> [t]he finance department wasn't performing the way I wanted it to. We weren't achieving the income I wanted to achieve. Procedures weren't being followed.
>
> * * *
>
> I wanted to replace both [Plaintiff and Mr. Harris]. We didn't have cooperation between the[m]. . . . Often I would go in to try to resolve a situation, I'd get one story from [Plaintiff] and one story from [Mr. Harris].

*Id.*, Vol. 2 at 499. (Mr. Harris left the company a few days after Plaintiff's termination.)

Even though we view the facts in the light most favorable to Plaintiff, "a challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate [the] plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). In this case Mr. Steven made all the hiring decisions and approved Plaintiff's termination, but Mr. Shaffer was the one who actually terminated Plaintiff. We must view the facts from his perspective. "The relevant inquiry is not whether [Mr. Shaffer's] proffered reasons were wise, fair or correct, but whether [he] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air*

-12-

*Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Plaintiff takes issue with Mr. Shaffer's statement that the finance department was not performing the way he wanted it to or earning the income he expected it to earn. She claims she "was performing very well under the circumstances created and imposed by [Steven Motors]." Aplt. App., Vol. 3 at 741. What we must look at, however, "is the manager's perception of the employee's performance . . ., not [the employee's] subjective evaluation of [her] own relative performance." *Jones*, 203 F.3d at 754 (internal quotation marks omitted). Moreover, the record evidence indicates that as an F&I Manager, Plaintiff earned $14,955 between January and July 2001, but that due to her guaranteed salary, she was paid $24,000. Thus, she "caus[ed] [Steven Motors] a loss of $9,045 in the first seven months of 2001." Aplee. Br. at 19; Aplt. App., Vol. 2 at 515.

Plaintiff also asserts that Mr. Harris's declaration (well after Plaintiff's termination) that he and Plaintiff "got along fine," Aplt. App., Vol. 4 at 824, creates a genuine issue regarding whether Mr. Shaffer's alleged reason for Plaintiff's termination was pretextual. We disagree. What is relevant is whether Mr. Shaffer honestly believed that Plaintiff and Mr. Harris were unable to get along. *See Bullington*, 186 F.3d at 1318. Plaintiff argues about the accuracy of

Mr. Shaffer's belief; that is, whether his belief that they did not get along was correct. But "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*." *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (internal citation and quotation marks omitted). Plaintiff fails to offer any evidence that Mr. Shaffer did not honestly believe that Plaintiff and Mr. Harris were at odds. In particular, Plaintiff offers no reason to question that Mr. Shaffer sincerely relied on the transcribed conversation between Mr. Johnson and Mr. Harris.

Further, the record reveals that Mr. Shaffer had spoken with Plaintiff approximately one month before her termination regarding "her level of commitment to the job[,] . . . the performance level of the finance department and [her] specific performance." Aplt. App., Vol. 2 at 493. He said he was concerned about Plaintiff's "failure to follow procedures[,] . . . [b]eing at work, and being available to work on car deals." *Id.* Mr. Shaffer testified that Mr. Harris complained to him on more than one occasion that Plaintiff intentionally avoided customers she thought were going to pay cash since cash customers are less likely to purchase financing and other products F&I Managers sold. The record bears this out: Mr. Harris saw a disproportionate number of the cash customers.

-14-

Mr. Shaffer met with Plaintiff after receiving her July 20, 2001, letter alleging retaliation for her pending lawsuit. He confirmed that her six-month base-salary guarantee expired six months from its inception. With regard to the bonus that Steven Motors paid Mr. Harris and not Plaintiff, Mr. Shaffer explained that he had set a goal for the finance department, divided that goal in half, and awarded Mr. Harris a bonus because he exceeded his half of the total objective. Plaintiff "never hit [her half of] the objective." *Id.* at 498.

It is Plaintiff's ultimate burden to demonstrate that Steven Motors' stated reasons for its employment decision are in fact pretext for unlawful discrimination. *See Jones*, 203 F.3d at 752-53. A plaintiff can show pretext by, for example, exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." *Garrett*, 305 F.3d at 1217 (internal quotation marks omitted). On this point, Plaintiff fails to meet her burden. We hold that Plaintiff's assertions about her own performance, and about the accuracy of Mr. Shaffer's beliefs are insufficient, without more, to raise a genuine issue that Steven Motors manufactured its proffered reasons for terminating her.

## IV. ADA Disparate-Treatment Claims

Plaintiff next claims that Steven Motors discriminated against her because of her disability, or because Steven Motors regarded her as disabled. "Disability" is a term of art under the ADA. That statute defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; . . . or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). To establish a prima facie case of disability discrimination, Plaintiff must demonstrate that (1) she has a disability within the meaning of the ADA; (2) she is qualified for the position she holds or desires; and (3) her employer discriminated against her because of her disability. *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1128 (10th Cir. 2003). The district court held that Plaintiff was not disabled within the meaning of § 12102(2)(A), despite her claims that "she is impaired in the major life activities of remembering, thinking or learning, and moving." Aplt. App., Vol. 5 at 1224. It likewise held that the evidence did not support an inference that Steven Motors regarded her as disabled within the meaning of § 12102(2)(C). As we proceed to explain, we agree with the district court that Plaintiff has not raised a genuine issue that she had a disability within the meaning of the ADA. Therefore, we need not address prongs two or three of her prima facie case.

-16-

## A.    Actual Disability

Under subsection (A) of § 12102(2),

> a plaintiff must show that an impairment substantially limits at least
> one major life activity.  This definition contains three elements.
> First, the plaintiff must have a recognized impairment; second, the
> plaintiff must identify one or more appropriate major life activities;
> and third, the plaintiff must show that the impairment *substantially*
> *limits* one or more of those activities.

*Doebele*, 342 F.3d at 1129 (internal citation omitted) (emphasis added)).

Plaintiff's disability claims are based entirely on her stroke, her "impairment."

On appeal Plaintiff identifies (1) "learning, thinking, and reasoning" and

(2) "moving" as the major life activities substantially limited by her stroke.  Aplt.

Br. at 47-48.  We assume, without deciding, that these are major life activities.

We therefore turn to the third element of § 12102(2)(A), whether "the

impairment substantially limits one or more of those activities."  Although the

question whether an impairment is substantially limiting is ordinarily a factual

question for a jury, it may be evaluated by the judge upon a motion for summary

judgment.  *Doebele*, 342 F.3d at 1129;  *Bristol v. Bd. of County Comm'rs*,

281 F.3d 1148, 1161 n.5 (10th Cir. 2002) (that the third element "is factual and

reserved for the jury does not preclude a court from deciding it in the appropriate

circumstance, e.g., upon a motion for summary judgment"),  *vacated in part on*

*different grounds*, 312 F.3d 1213 (10th Cir. 2002) (en banc).

A physical or mental impairment is substantially limiting if the affected individual is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Doebele*, 342 F.3d at 1130 (internal quotation marks omitted). "In making this determination we consider three factors: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." *Id.* (internal quotation marks omitted).

"'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002) (quoting Webster's Third New Int'l Dictionary 2280 (1976)). "'[S]ubstantial' . . . clearly precludes impairments that interfere in only a minor way with the performance of [major life activities]." *Id.* at 197. Moreover, "substantially" must "be interpreted strictly." *Id.* "[T]o be substantially limited . . . an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central

-18-

importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Id.* at 198.

By these standards, Plaintiff did not suffer substantial limitations. After her stroke, Plaintiff had to undergo a "relearning process." Aplt. Br. at 7-8. According to her testimony below, she has not fully recovered. "[S]he overcome[s problems] on a daily basis," Aplt. App., Vol. 1 at 151, and experiences "glitches" when trying to reason or do math. *Id.* at 229. But these are not *substantial* limitations. Indeed, when asked at her deposition whether she felt "[her] ability to learn is any less now than it was prior to your stroke," she replied "Probably not." *Id.* at 151.

As for "moving," Plaintiff claimed that "[h]er ability to move freely remains significantly impaired by the stroke." Aplt. Br. at 8. Her further elaboration, however, failed to support that assertion. She offered only that she occasionally finds herself off balance while walking or using the stairs; her "right toe will hang up on something that is not there[;]" sometimes her "right side . . . is a little bit slower than the rest of [her]," Aplt. App., Vol. 1 at 151; and she now avoids some of the hobbies she enjoyed prior to her stroke, such as water skiing and gardening. The following exchange occurred at her deposition:

> Q:     As we sit here today, do you have any continuing effect from
>          the stroke you had in July of '99?

-19-

A:    No, I would say it is nothing short of a miracle. Except . . .
I have to watch my step. And occasionally I lose my balance
. . . . I have slipped or tripped.

*Id.* at 150.

"Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota*, 534 U.S. at 195. We agree with the district court that as a matter of law, Plaintiff was not actually disabled under § 12102(2)(A).

## B.    Regarded as Disabled

Plaintiff also contends that Steven Motors regarded her as having an impairment that substantially limits a major life activity. To support her position, she claims that "[Mr.] Johnson gave [her] the impression that she was so used up." Aplt. Br. at 50 (internal quotation marks omitted). She also offers his statement that she "ha[d] worked the old body pretty hard." Aplt. App., Vol. 1 at 146. We are not persuaded.

> The EEOC regulations provide, "[w]ith respect to the major life activity of working–(i) The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities."

*Sorensen v. Univ. of Utah Hosp*., 194 F.3d 1084, 1088 (10th Cir. 1999) (quoting 29 C.F.R. § 1630.2(j)(3)).

The evidence belies Plaintiff's contention that Steven Motors regarded her as substantially limited from working. "'[T]o be regarded as substantially limited

-20-

in the major life activity of working, one must be regarded as precluded from more than a particular job.'" *McKenzie v. Dovala,* 242 F.3d 967, 971 (10th Cir. 2001) (quoting *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999)). *Compare Sorensen*, 194 F.3d at 1089 (employee did not raise genuine issue of material fact when employer regarded employee as precluded only from one particular nursing job) *with McKenzie,* 242 F.3d at 972 (employee raised genuine issue of material fact when she offered evidence that sheriff perceived her as unemployable in any law enforcement job).

Plaintiff alleges that "[Mr.] Johnson's actions indicate he believed [she] was disabled from a class or range of jobs." Aplt. Br. at 50. But it is undisputed that Steven Motors placed Plaintiff in a Fleet and Leasing Manager position after her stroke, and later promoted her to F&I Manager. The district court correctly held that as a matter of law Plaintiff was not regarded as disabled by Steven Motors.

## V.    Retaliation Claims

Finally, Plaintiff appeals the district court's grant of summary judgment on her retaliation claims. Plaintiff does not identify the specific anti-retaliation statutes under which she proceeds. But we assume that she advances her arguments under 29 U.S.C. § 623(d) (ADEA retaliation), 42 U.S.C. § 2000e-3(a) (Title VII retaliation), and 42 U.S.C. § 12203(a) (ADA retaliation).

The ADEA's anti-retaliation provision forbids an employer from discriminating against an employee because she "has opposed any practice made unlawful" by the statute, or because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" under the statute. 29 U.S.C. § 623(d). The anti-retaliation provisions of Title VII and the ADA "are materially identical" to the ADEA's provisions. *Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir.), *cert. denied*, 124 S. Ct. 957 (2003); *see* 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation under the ADEA, Title VII, or the ADA, Plaintiff must show (1) she engaged in protected activity; (2) she suffered adverse action at the hands of Steven Motors "either after or contemporaneous with" her protected activity; and (3) "a causal connection between" her protected activity and Steven Motors' "adverse action." *Doebele*, 342 F.3d at 1135 (ADA case) (internal quotation marks omitted). *See Mattioda v. White*, 323 F.3d 1288, 1293 (10th Cir. 2003) (Title VII case); *Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498, 1507 (10th Cir. 1996) (ADEA case). The district court concluded that summary judgment was appropriate for Plaintiff's retaliation claims. We agree.

Plaintiff contends that her correspondence of September 16, 1999, and October 22, 1999; her administrative complaints; and her lawsuit "constitute protected participation" or "protected opposition" to discrimination. Aplt. Br.

at 55 n.9. In fact, "[i]nformal complaints to superiors," *O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1255 (10th Cir. 2001), administrative charges, and litigation are protected activity. 29 U.S.C. § 623(d); 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 12203(a).

We do not, however, agree with Plaintiff that all ten allegedly adverse actions she experienced were indeed "adverse" under our precedent. We recognize that this Circuit "liberally define[s]" "adverse employment action." *Stinnett*, 337 F.3d at 1217 (internal quotation marks omitted). "Such actions are not simply limited to monetary losses in the form of wages or benefits." *Id.* (internal quotation marks omitted). We consider whether a particular action was adverse on "a case-by-case [basis], examining the unique factors relevant to the situation at hand." *Id.* (internal quotation marks omitted). Nonetheless, "[t]o be an adverse action, the employer's conduct must be materially adverse to the employee's job status." *Wells*, 325 F.3d at 1213 (internal quotation marks omitted). It must "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Stinnett*, 337 F.3d at 1217 (internal quotation marks omitted). "Actions presenting nothing beyond a mere inconvenience or alteration of responsibilities, however, do not constitute adverse employment action." *Id.* (internal quotation marks omitted).

-23-

Plaintiff appears to claim that Steven Motors engaged in the following adverse actions: (1) failed to place her in the General Manager position when it fired Elden Hull; (2) placed her in a position that required travel; (3) insisted she move out of the owner's office; (4) interfered with her ability to communicate with customers; (5) allowed Christine Enquist to interfere with Plaintiff's car deals; (6) interfered with Plaintiff's return to work; (7) transferred her from one dealership to another; (8) paid her $1,000 less per month in guaranteed base salary when she returned to work after her stroke; (9) failed to return her to the position of General Manager; and (10) fired her. Of these ten allegedly adverse actions, number one is raised for the first time on appeal and therefore will not be considered. *See Steele v. Thiokol Corp.*, 241 F.3d 1248, 1253 (10th Cir. 2001). With regard to numbers two through eight, the district court said: "[T]hese events fail to constitute a significant change in [Plaintiff's] employment status, are based on inadmissible evidence, or both." Aplt. App., Vol. 5 at 1226 n.4. We agree with respect to numbers two through seven.

We start with allegation number two. Steven Motors' placing Plaintiff in the Fleet and Leasing Manager position after her stroke was not an adverse employment action simply because it required her to travel. We agree with the district court that Steven Motors' requirement that Plaintiff travel failed to constitute a significant change in Plaintiff's employment status. *See, e.g.,*

-24-

*Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (teacher's longer commute after being transferred from one school to another not adverse employment action when teacher's salary and benefits remained the same).

Plaintiff fares no better with her third allegation that in response to her protected activity, Steven Motors ordered her to move out of Mr. Steven's office. Steven Motors' requirement that Plaintiff not occupy the owner's office does not constitute a significant change in her employment status. *See, e.g., Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847, 851, 857 (10th Cir. 2000) (employer's relocating senior sales representative's desk, while she was away from the office on sick leave and short-term disability, did not rise to the level of an adverse employment action).

Plaintiff's fourth contention, that Steven Motors' receptionists interfered with her ability to communicate with her customers, is also unsuccessful. To support this contention, Plaintiff offers only out-of-court statements attributed to Plaintiff's customers to prove that the receptionists withheld messages and told Plaintiff's customers that she no longer worked at Steven Motors. Such evidence is inadmissible hearsay, Fed. R. Evid. 801(c), "not suitable grist for the summary judgment mill." *Wright-Simmons v. Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (internal quotation marks omitted).

Plaintiff's fifth contention, that Ms. Enquist interfered with Plaintiff's car deals is not supported by proper evidence. In an affidavit by Mr. Scott, he states that "[a]fter [Plaintiff] had agreed on a deal, Ms. Enquist would lower [Steven Motors'] bid on the trade-in in an effort to ruin [Plaintiff's] deal." Aplt. App., Vol. 4 at 984. The affidavit fails to show, however, how Mr. Scott could have personal knowledge of Ms. Enquist's alleged actions. Plaintiff also testified that Walt Lesline told her that Ms. Enquist had lowered Plaintiff's bid on a Cadillac "from 10 to 8 [thousand dollars.]" *Id.*, Vol. 1 at 127. But Mr. Lesline's alleged statement to Plaintiff was made out-of-court and is offered to prove that Ms. Enquist lowered Plaintiff's bids–it is therefore inadmissible hearsay. *See* Fed. R. Evid. 801(c). Although Plaintiff attempts to support her contention with direct testimony of Walt Lesline, that testimony does not assist her. Mr. Lesline indicated that Ms. Enquist wanted to review not only his "appraisals regarding [Plaintiff's] cars," but "everybody's" appraisals regarding everyone's cars. Aplt. App., Vol. 3 at 631. Mr. Lesline testified that he did not recall Ms. Enquist "ever changing the bids that [Plaintiff] had made on her cars[.]" *Id.* Additionally, Plaintiff herself testified that general managers have the authority to change bids.

We also agree with the district court regarding Plaintiff's sixth retaliation allegation on appeal. Steven Motors' alleged interference with Plaintiff's return to work was not an adverse employment action. Even assuming that Steven

-26-

Motors deliberately failed to return several of Plaintiff's telephone inquiries about the position she would hold when she recuperated from her stroke, the fact remains that Plaintiff *did* resume her employment within several days of her intended start date. Steven Motors' failure to return several telephone calls was not materially adverse to Plaintiff's job status. *See Wells*, 325 F.3d at 1213.

Likewise, Steven Motors' transfer of Plaintiff from one dealership to another was not an adverse employment action. This was a lateral move that did not result in a significant change in Plaintiff's employment status.

As for alleged adverse action number eight–the reduction in Plaintiff's guaranteed base salary upon her return to work–we understand this claim to be encompassed by her claim (number nine) that she was not rehired as General Manager after her stroke. She makes no argument that Steven Motors retaliated against her by not paying her as much for her work in the Fleet and Leasing position as for a General Manager position.

We now turn to alleged adverse actions nine and ten–Steven Motors' failure to return Plaintiff to the position of General Manager after her stroke and its termination of her employment. As discussed in Part III, we agree that both are adverse actions.

Plaintiff's claim based on Steven Motors' decision not to return Plaintiff to the position of General Manager fails because Steven Motors' adverse action

occurred before Plaintiff's first protected activity. On September 13, 1999, Steven Motors told Plaintiff she would not be able to return to her General Manager position. But Plaintiff did not engage in her first protected activity until September 16, 1999 (her letter to Steven Motors alleging that she would have her job back if she were younger or male). *See Kendrick*, 220 F.3d at 1233-34 (employer's decision to discharge truck driver not retaliatory because employer's decision pre-dated truck driver's filing of a union grievance).

As for Plaintiff's claim that Steven Motors fired her on July 23 in retaliation for her July 11 and 12 deposition testimony and for her July 20 written complaint to Mr. Shaffer, we will accept Plaintiff's contention that she made a prima facie case. But for the same reasons that we rejected her disparate-treatment discrimination claims, we hold that she has failed to satisfy her ultimate burden of rebutting defendant's stated reason for its employment decision. As explained above in Part IIIB, Plaintiff's opinions about her own performance and assertions about the accuracy of Mr. Shaffer's beliefs fail to establish that Steven Motors manufactured its proffered reasons for terminating her.

**VI.     Conclusion**

We AFFIRM the judgment of the district court granting Steven Motors summary judgment on all Plaintiff's claims.

Entered for the Court


Harris L Hartz
Circuit Judge