**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 3, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DENNIS CARTER,

        Plaintiff–Appellant,

v.

PATHFINDER ENERGY
SERVICES, INC.,

        Defendant–Appellee.

No. 10-8112

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 1:08-CV-00282-NDF)**

---

Jeffrey C. Gosman, Gosman Law Office, Casper, Wyoming, for Plaintiff–Appellant.

Christopher E. Moore (Christine M. White with him on the brief), Coats Rose, New Orleans, Louisiana, for Defendant–Appellee.

---

Before **KELLY**, **LUCERO**, and **GILMAN**, Circuit Judges.[*]

---

**GILMAN**, Circuit Judge.

---

    Dennis Carter began working as a directional driller at Pathfinder Energy Services, Inc., in December 2004. Two years later, after Carter's declining health had caused a

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Court Judge for the Sixth Circuit, sitting by designation.

reduction in his workload, Pathfinder fired Carter for "gross misconduct" based primarily on an altercation that he had had with a coworker and his language and attitude during a conversation with his supervisor.

Carter then sued Pathfinder in federal district court, alleging that Pathfinder had violated his rights under the Americans with Disabilities Act (ADA) and the Employee Retirement Income Security Act (ERISA). He also alleged that Pathfinder had breached his implied-in-fact employment contract. The district court granted summary judgment in favor of Pathfinder on all three claims. For the reasons set forth below, we **REVERSE** the district court's grant of summary judgment on Carter's ADA claim, **AFFIRM** the district court's grant of summary judgment on the remaining claims, and **REMAND** the case for further proceedings on the ADA claim.

## I. BACKGROUND

Because this is an appeal from a grant of summary judgment, we have set forth the following facts in the light most favorable to Carter, the party against whom summary judgment was entered. *See Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1078 (10th Cir. 1997). All reasonable inferences from the factual record have been drawn in his favor.

Carter is a diabetic. He also suffers from fibromyalgia, which is a chronic pain condition, and postural hypotension, which causes a drop in blood pressure whenever he stands up. These conditions currently combine to render Carter totally disabled.

Before he became totally disabled, Carter worked at Pathfinder, an energy company located in Casper, Wyoming. His work as a directional driller was a demanding

job that entailed long shifts—often 24 hours or more—involving the drilling of non-vertical oil wells.  Carter's employment with Pathfinder began in late December 2004, after Carter had been diagnosed with diabetes and fibromyalgia.  Pathfinder was aware of at least his diabetes when it hired Carter.  The record does not reflect whether it also knew about his fibromyalgia.

Carter signed Pathfinder's offer of employment in January 2005, several days after he was hired.  The offer explained that it shall not "be construed as an employment contract" and that "[e]mployment with the Company is at the will of the Company with or without notice and with or without cause and may be terminated at any time."  At the same time that he signed the offer, Carter also signed his employment application.  In bold, the application explicitly stated:

> I understand and agree that nothing contained in this application, or conveyed during any interview, is intended to create an employment contract.  I further understand and agree that if I am hired, my employment will be "at will" and without fixed term, and may be terminated at any time, with or without cause and without prior notice, at the option of either myself or the Company.  No promises regarding employment have been made to me, and I understand that no such promise or guarantee is binding upon the Company unless made in writing.

Two other documents—Pathfinder's employee handbook and Carter's signed receipt for the handbook—further advised that Carter's employment was at will and that he could be fired at any time for any reason.  Somewhat contradictorily, the handbook outlined the possible grounds for dismissal and set forth Pathfinder's progressive disciplinary policy, under which an employee's misconduct typically receives one or more warnings before

-3-

termination. The handbook was given to Carter prior to signing the other documents described above.

Carter's first 20 months on the job passed smoothly. He worked full-time and was never given a warning or disciplined for bad behavior. During this time, Carter controlled his diabetes primarily through diet and exercise. He took oral medication as well, albeit irregularly.

In the fall of 2006, however, Carter's health began to worsen. He felt increasingly weak and fatigued, and lost significant body weight. By October, his health had deteriorated to the point where he could no longer work full-time as a directional driller. Carter discussed his health problems with Rich Arnold, his supervisor at Pathfinder, and explained his need for more rest. His workload was subsequently cut in half. Whereas Carter had worked two 10-to-12-day job assignments per month in the past, he would now work just one assignment per month.

By November, Carter's health had declined to the point where his friends had to help him prepare his food, get dressed, feed his pets, do laundry, shop for groceries, and shower. But because his reduced workload gave him time to rest and recover in between job assignments, Carter remained able to work full 24-hour shifts while on the job, even as his health continued to deteriorate.

The exact cause of Carter's deteriorating heath is not clear from the record. But sometime near the end of 2006, Carter contracted hepatitis C, an infectious disease that causes inflammation of the liver. Although he was not diagnosed with this disease until

January 2007—after his employment with Pathfinder had ended—he began experiencing its symptoms before then. A visit to the doctor on December 1, 2006 revealed potential problems with his liver, a symptom consistent with hepatitis C but not diabetes.

After that doctor's visit, Carter resumed taking oral medication for his diabetes. He had not taken the medication during the fall of 2006 because he believed that minding his diet and exercise had been effective at controlling his diabetes in the past, and that the medication was of limited help to him. In addition, the doctor who had been helping Carter manage his diabetes suddenly retired from medicine in September 2006. Carter spent several months trying to find a new doctor to treat his diabetic condition.

On December 22, 2006, as Carter was finishing up a 10-day job assignment, Arnold asked Carter to immediately work another job for Ultra Petroleum. Carter agreed. But on his way to the Ultra job site the next day, Carter called Arnold and told him that he was no longer feeling well enough to work and needed time off to rest and recover from his last job assignment before starting a new one.

The conversation then became somewhat tense. Arnold said that he would have to call the other Pathfinder driller assigned to the Ultra job and "let him know you're not going to be there to help him." Not wanting to let his coworker down, Carter agreed to work the job despite his health problems, using an expletive that he has testified "is constantly used in the oil field." He told Arnold: "Well, Rich, I'll fucking go. . . . I know what it's like to work by yourself and I don't like it, so I'll go. But when I get back, I'm going to go to my doctor and get you a letter stating that at this time I'm unable

to work." Arnold replied that Carter had taken "more days off than anybody," to which Carter reacted defensively, saying: "I have been sick and you know I have been sick."

Carter also mentioned that he might need to seek short-term and long-term disability benefits under Pathfinder's employee-benefit plan, that Pathfinder "can't just take those benefits away," and that he would see Arnold and Pathfinder "in court" if Pathfinder took the benefits away. Arnold responded: "You won't see me in court." Carter then abruptly ended the conversation.

Shortly thereafter, Carter arrived at the Ultra job site, which included overnight rooms for employees. He went to his room and saw that his bunkmate had left a pair of pants on the lower bunk. Carter moved the pants to the upper bunk, placed his sleeping bag on the lower bunk, and went to sleep. When he awoke, Carter found out that his bunkmate, who worked at Pathfinder as a measure-while-drilling hand (or MWD, for short) and who had just completed a 40-hour shift, was upset that Carter had taken the lower bunk. Carter overheard the MWD telling Dave Wheeler, another Pathfinder directional driller, about what had happened. Wheeler informed the MWD that Carter was justified in taking the bunk because directional drillers typically get to choose their beds first. Carter then chimed in. He minced no words: "[I]t don't make a fuck to me. I can go into town and get a motel room, you know. So it doesn't make a fuck to me." Carter then took the upper bunk, and that was the extent of the incident.

The next day, on December 24, 2006, Carter found blood in his urine and went home sick. Arnold told Carter that the two needed to meet "after Christmas." On

December 27, 2006, Arnold and Carter discussed the incident with the MWD from a few days earlier. Arnold had heard that Carter told the MWD to "fuck off." Carter responded by giving his version of the events, which are recounted above. After the two finished discussing the incident with the MWD, Arnold fired Carter for gross misconduct, citing Carter's inability to get along with others. Arnold's deposition testimony explained that he fired Carter based on "two instances": (1) Carter's altercation with the MWD, and (2) Carter's use of the "I'll fucking go" expletive and his abruptness in hanging up the telephone on Arnold.

After Carter was told that he was being fired, Carter mentioned to Arnold that "part of the reason for me being probably grouchy was my diabetes was out of control at the time." Arnold replied that other drillers were working 25 to 26 days per month, and he was concerned that they would start quitting if he did not fire Carter. He also noted, incorrectly, that Carter was not capable of working 24-hour shifts. Arnold denied Carter's requests both for additional time to address his health issues and to retain access to his medical benefits.

Carter was diagnosed with hepatitis C in early January 2007. He was found to have postural hypotension sometime thereafter. In May 2007, Carter began undergoing Interferon treatment for hepatitis C, at which point he became totally disabled. He no longer suffers from the symptoms of hepatitis, but has remained unable to work since May 2007. Carter testified at his deposition that he could have kept working at Pathfinder

until that time, provided that he was given time off to rest and recover between job assignments.

In December 2008, Carter brought suit against Pathfinder, alleging that he had been fired in violation of ERISA and that Pathfinder had breached his implied-in-fact employment contract by terminating his employment without warning. He later amended his complaint to include a claim under the ADA. The district court granted summary judgment to Pathfinder on all three claims. This appeal followed.

## II. ANALYSIS

### A. Standard of review

We review a district court's grant of summary judgment de novo. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact "exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Zwygart v. Bd. of Cnty. Comm'rs*, 483 F.3d 1086, 1090 (10th Cir. 2007) (internal quotation marks omitted).

### B. Carter's ADA claim

Carter argues that Pathfinder discriminated against him based on his disability, in violation of the ADA's anti-discrimination provision. *See* 42 U.S.C. § 12112(a). We apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973), to ADA discrimination claims. *C.R. England*, 644 F.3d at 1038. Under this framework, Carter bears the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. If he is able to make such a showing, the burden would shift to Pathfinder "to articulate some legitimate, nondiscriminatory reason" for its actions. *See id.* Carter would then bear the ultimate burden of showing that Pathfinder's proffered reason is in fact a pretext designed to mask discrimination. *See id.* at 804.

### 1.     *Prima facie case*

We begin our analysis by determining whether Carter has produced enough evidence to allow a reasonable jury to conclude that he has established a prima facie case of discrimination. This burden is "not onerous." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (internal quotation marks omitted). Carter must show that, at the time he was fired, (1) he was a disabled person as defined by the ADA; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he was fired because of his disability. *Zwygart*, 483 F.3d at 1090. The district court held that Carter did not meet elements one or three. We disagree, and conclude that Carter has established that a genuine dispute of material fact exists as to all three elements.

### a.     *Whether Carter was "disabled" under the ADA*

A person is "disabled" under the ADA if he has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). To

satisfy this definition, "a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007) (internal quotation marks omitted). Whether a plaintiff has met the first two requirements are questions of law for the court. *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003). But whether the impairment substantially limits a major life activity is ordinarily a question of fact for the jury. *Id.* We will address each requirement in turn.

### i. *Physical or mental impairment*

The ADA does not define the term "physical or mental impairment." But a regulation promulgated by the Equal Employment Opportunity Commission (EEOC) and in effect when Carter was fired defines the term to cover "[a]ny physiological disorder, or condition . . . affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, [or] digestive . . . ." 29 C.F.R. § 1630.2(h)(1) (2006) (amended 2011).

Pathfinder has not contested that Carter meets this definition. Nor could it successfully do so. Carter has submitted medical testimony showing that he had diabetes and hepatitis C in the fall of 2006 and that these diseases affected his digestive and circulatory systems during that period of time. He has therefore established that he had a physical impairment within the meaning of the ADA. *See Lawson v. CSX Transp., Inc.*,

-10-

245 F.3d 916, 923 (7th Cir. 2001) (holding that the plaintiff's diabetes and related medical conditions, which affected "many of the organ systems in his body," were physical impairments under the ADA (internal quotation marks omitted)).

### ii. Major life activities

The next question is whether Carter has identified at least one "major life activity" that was affected by his impairment. *See Berry*, 490 F.3d at 1216. At the time that Carter was fired from Pathfinder, the ADA did not define the term "major life activities." So we again look to the relevant EEOC regulation, which this court has recognized is "entitled to a great deal of deference." *Jarvis v. Potter*, 500 F.3d 1113, 1121 (10th Cir. 2007) (internal quotation marks omitted). This regulation defines "major life activities" as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2006) (amended 2011). Although this definition uses broad language, the Supreme Court has interpreted it "strictly," holding that the definition "refers to those activities that are of central importance to daily life." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553.

Even applying the EEOC's definition strictly, as we must, we conclude that Carter has identified at least one major life activity. Carter first claims that he had difficulty caring for himself, which "encompasses normal activities of daily living; including feeding oneself, driving, grooming, and cleaning home." *See Holt v. Grand Lake Mental*

-11-

*Health Ctr., Inc.*, 443 F.3d 762, 767 (10th Cir. 2006) (internal quotation marks omitted).

He asserts that he needed help showering, eating, doing laundry, and getting dressed,

among other activities. These activities are plainly "of central importance to daily life."

*See Williams*, 534 U.S. at 197.

In addition, Carter has identified two other major life activities affected by his

impairment: performing manual tasks and working. Performing manual tasks is a major

life activity under the ADA so long as "the manual tasks in question [are] central to daily

life." *Id.* The tasks that Carter has pointed to—getting dressed, showering, tending to

personal hygiene, shopping for groceries, carrying out personal and household

chores—meet this definition. Moreover, Carter identifies the activity of working, which

this court has repeatedly recognized as a major life activity. *See Dillon v. Mountain Coal

Co.*, 569 F.3d 1215, 1218 (10th Cir. 2009) ("Working is a 'major life activity.'");

*MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1275 (10th Cir. 2005) ("[T]his

court has recognized 'working' as a major life activity."). He has therefore easily met the

second element of the ADA's definition of disability.

### iii. Substantial limitation

The final element of the ADA's definition of disability describes the relationship

that must exist between the first two elements. A disability exists under the statute only

where a physical or mental impairment "substantially limits" a major life activity. 42

U.S.C. § 12102(1)(A). Because this is a factual determination, *see Doebele v.

Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003), the relevant question for

the purpose of this appeal is whether Carter has presented enough evidence to create a genuine dispute as to any material fact that necessitates resolution by a jury.

Although the ADA does not define the term "substantially limits," this court has held that "[a]n impairment is substantially limiting when it renders an individual either unable or significantly restricted in her ability to perform a major life activity compared to the average person in the general population." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1218 (10th Cir. 2010) (internal quotation marks omitted). This inquiry is based on an individual's "own experience"—particularly where "the impairment is one whose symptoms vary widely from person to person," *Williams*, 534 U.S. at 198-99—because "an impairment that is disabling for some may not be disabling for others," *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 496 (10th Cir. 2000).

In holding that Carter was not substantially limited in one or more major life activities, however, the district court did not undertake an individualized analysis; instead, the court found that Carter was not disabled under the ADA because "[m]edication-controlled or diet-controlled diabetes is not a substantially limiting condition." The key authority for this proposition is *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), which held that disability under the ADA "is to be determined with reference to corrective measures." *Id.* at 488.

As an initial matter, we must determine whether *Sutton* even governs this case. Congress amended the ADA in 2008 "to correct what it viewed as an overly restrictive interpretation of the statute's terms that had been adopted by the Supreme Court in *Sutton*

-13-

and *Williams*." *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 855 (5th Cir. 2010); *see* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. But the ADA Amendments Act (ADAAA) did not go into effect until January 1, 2009—after the allegedly discriminatory conduct in this case occurred. Because the ADAAA does not operate retroactively, *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1261 n.2 (10th Cir. 2009), we apply the law as it stood prior to the enactment of the ADAAA. We will therefore analyze the question of Carter's substantial limitation under the rubric of *Sutton*.

The petitioners in *Sutton* had severe myopia. They argued that this condition constituted a disability for purposes of the ADA because, left uncorrected, it substantially impaired their ability to see. But their myopia was *not* left uncorrected: they wore contact lenses that fully corrected their visual impairments, giving them vision that was 20/20 or better. The Supreme Court held that the petitioners did not have a disability under the ADA because "the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment." 527 U.S. at 475. As the Court put it, "if the impairment is corrected"—whether by contact lenses, medication, or other measures—"it does not 'substantially limit' a major life activity." *Id.* at 483 (brackets omitted). So "[a] diabetic whose illness does not impair his or her daily activities" is not "disabled simply because he or she has diabetes." *Id.*

But *Sutton* also made clear that hypothetically controllable disabilities are not automatically to be judged in their corrected state. "The use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends

-14-

on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting." *Id.* at 488 (emphasis in original). Thus, the district court's conclusion that "[m]edication-controlled or diet-controlled diabetes is not a substantially limiting condition" may indeed be correct as a general proposition of law, but it begs the question whether Carter *actually* was able to control his diabetes through medication or diet. The evidence in the record casts significant doubt on whether he was able to do so. He did not take diabetes medication in the fall of 2006, and his attempts to manage his diabetes through diet and exercise seem to have failed.

To be sure, Carter *could have* taken oral medication for his diabetes in addition to relying on diet and exercise. And there are district court cases from outside this circuit holding that "[a] plaintiff who does not avail himself of corrective medication is not a qualified individual under the ADA." *See Hewitt v. Alcan Aluminum Corp.*, 185 F. Supp. 2d 183, 189 (N.D.N.Y. 2001) (failing to take medication for post traumatic stress disorder); *see also Tangires v. Johns Hopkins Hosp.*, 79 F. Supp. 2d 587, 596 (D. Md. 2000) (failing to take medication for asthma), *aff'd*, 230 F.3d 1354 (4th Cir. 2000). *But see Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666-67 (7th Cir. 1995) (treating a diabetic who did not control his disease with medication as disabled under the ADA).

Yet even assuming without deciding that we found the reasoning in *Hewitt* and *Tangires* persuasive, their facts are readily distinguishable from the record before us. The plaintiff in *Hewitt* admitted that his disease was correctable by medication that he nevertheless refused to take. 185 F. Supp. 2d at 189. And the plaintiff in *Tangires* had

-15-

asthma that, according to the medical evidence in the record, was "readily treatable" by medication. 79 F. Supp. 2d at 595. Here, in contrast, Carter has met his burden of raising a genuine dispute as to whether he would have been symptom-free even if he had taken medication for his diabetes before December 2006. He was suffering from hepatitis C as well as diabetes at the time that he was fired. In addition, despite the fact that Carter has been taking oral medication for his diabetes since his termination, he is now fully disabled. Given these facts, we cannot definitively conclude that oral medication would have controlled his impairments.

We therefore proceed to the question of whether Carter's impairments in fact substantially limited a major life activity. Three factors govern this inquiry: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1130 (10th Cir. 2003) (internal quotation marks omitted). Carter has submitted evidence showing that his diabetic impairment was both long-term and severe at the time that he was fired. He was diagnosed with diabetes years before his termination from Pathfinder, and the disease still afflicts him today. In addition, Carter suffered from the symptoms of hepatitis C at the time that he was fired.

Carter has also proffered medical evidence that corroborates his own deposition testimony that he was too weak to perform a wide variety of common household tasks that an average person could perform without difficulty. Taken together, there is enough

evidence in the record for a jury to conclude that Carter's impairments substantially limited his ability to perform manual tasks or care for himself in comparison to the abilities of an average person. *See Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 857-59 (5th Cir. 2010) (holding that the plaintiff's testimony that his arthritis at times made him unable to walk, along with corroborating medical records, was enough to allow a jury to conclude that plaintiff was substantially limited in his ability to walk).

In arguing otherwise, Pathfinder fundamentally misunderstands the requirements of the ADA. Pathfinder contends that Carter was not substantially limited because he could perform the essential functions of his job; that is, he could work full 24-hour shifts. Of course, Pathfinder elsewhere contends that Carter was totally disabled at the time that he was fired, which directly contradicts its argument that Carter did not then have a substantially limiting condition. But setting aside this contradiction, Pathfinder's argument fails because there is "no support in the Act, [the Supreme Court's] opinions, or the regulations for the . . . idea that the question of whether an impairment constitutes a disability is to be answered only by analyzing the effect of the impairment in the workplace." *See Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 201 (2002). "[T]he manual tasks unique to any particular job are not necessarily important parts of most people's lives." *Id.*

In any event, the record suggests that Carter *was* impaired in his ability to perform his job at Pathfinder. Although he could work the full 10 to 12 days at a job site while completing full 24-hour shifts, he needed time off to rest in between working such job

-17-

assignments. This is perfectly consistent with a finding that his impairments substantially limited his ability to perform manual tasks and take care of himself.

Finally, we emphasize that we are not holding that Carter has produced enough evidence for a jury to conclude that he was substantially limited in the major life activity of "working"—which requires, "at a minimum, that [he] allege [that he was] unable to work in a broad class of jobs" at the time that he was fired. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Instead, we adhere to our practice of considering "the major life activity of 'working' . . . only as a last resort." *See E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1162 n.5 (10th Cir. 2006) ("If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working." (internal quotation marks omitted)) We therefore make no determination as to whether a reasonable jury could find that Carter was substantially limited in working.

### b. *Whether Carter was qualified to perform the essential functions of his job*

Having established the existence of a genuine dispute of material fact as to the first element of his prima facie case, Carter must next show that he has produced enough evidence for a reasonable jury to find that he was qualified, with or without reasonable accommodation, to perform the essential functions of his job at the time that he was fired. *See Zwygart v. Bd. of Cnty. Comm'rs*, 483 F.3d 1086, 1090 (10th Cir. 2007). He argues

that he has done so because he could work at a job site for the full 10 to 12 days that he was needed—and for full 24-hour shifts while he was there—so long as he was given time off to rest in between working such job sites. Put differently, he argues that, with the reasonable accommodation of part-time work, he could perform the essential functions of his job.

Whether part-time work "is a reasonable accommodation under the ADA is a mixed question of law and fact involving primarily legal principles." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002) (treating the question of whether medical leave is a reasonable accommodation under the ADA as a mixed question of law and fact). The term "reasonable accommodation" under the ADA explicitly includes part-time work. 42 U.S.C. § 12111(9)(B) ("The term 'reasonable accommodation' may include . . . part-time or modified work schedules . . . ."). But "an employee who proposes this accommodation may only prevail in an ADA action if he can demonstrate that he could perform the essential functions of his job while working part-time." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 336 n.5 (2d Cir. 2000).

For a number of positions, this will prove difficult to do because regular attendance may fairly be characterized as an essential function of some jobs. *See DeVito v. Chicago Park Dist.*, 270 F.3d 532, 534 (7th Cir. 2001) (holding that, "in the case of a full-time job," the essential functions of the job include the "capab[ility] of working full-time"). The job of a high school teacher, for example, has been held not to accommodate irregular and unpredictable attendance. *Nowak v. St. Rita High Sch.*, 142 F.3d 999,

-19-

1003-04 (7th Cir. 1998) (holding that a high school teacher who could not come to work on a regular basis could not perform the essential functions of his job).

Pathfinder, however, does not argue that Carter's position as a directional driller is a position where full-time attendance is essential. Nor does it argue that Carter's need for rest between jobs rendered him incapable of meeting its reasonable job expectations. Pathfinder in fact concedes that "Carter was qualified for his position as a directional driller during his employment with Pathfinder." And the evidence suggests that Pathfinder is right in doing so. Carter's capabilities were roughly the same as other directional drillers at Pathfinder, except that he could work only one 10-to-12-day job per month as opposed to two. In this way, a "modified work schedule" accommodated his inability to work for protracted periods, as expressly contemplated by the ADA. *See* 42 U.S.C. § 12111(9)(B).

But Pathfinder argues that even if Carter was qualified for his job during his employment with Pathfinder, he has not been qualified for his position "since the day of his termination." It therefore contends that he cannot meet the second requirement of his prima facie showing. We do not find this argument persuasive. Carter was working full 24-hour shifts for the typical 10-to-12-day job up until the day that he was fired. The only reason that he could not complete his final job was because he had just completed a full job at another site and did not receive time off to rest and recover. He had been receiving this "rest and recover" accommodation for approximately two months. Although it is true that Carter did not try to seek employment after he was fired by

-20-

Pathfinder, there is enough evidence for a reasonable jury to conclude that at the time of his firing—which is the relevant time for purposes of the ADA—Carter could still perform the essential functions of his job with reasonable accommodation. He has therefore established the existence of a genuine dispute of material fact as to the second element of his prima facie showing.

### c.    *Whether Carter was fired because of his disability*

The final element of Carter's prima facie showing is causation. *See* 42 U.S.C. § 12112(a) (2006) ("No covered entity shall discriminate against a qualified individual with a disability *because of* the disability of such individual in regard to . . . [the] discharge of employees . . . ." (emphasis added)) (amended 2009). To survive summary judgment, Carter must produce enough evidence for a reasonable jury to conclude that he was fired because of his disability. We conclude that he has done so.

Carter testified at his deposition that Arnold told him that "other employees [were] working 25, 26 days" per month and that Arnold "felt they were going to start quitting" if Carter was not fired. Further, Carter said that Arnold told him (incorrectly, according to Carter) that "you can't work 24-hour shifts, so there you go." These statements could lead a jury to reasonably conclude that Carter was fired because he needed more rest than others between jobs—that is, because he had a disability that Pathfinder no longer wanted to accommodate. *See E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1167 (10th Cir. 2006) ("[The supervisor's] expression of concern . . . that there would be 'mass exodus' if the

clients found out that the cook had hepatitis supports a finding that [the plaintiff] was therefore fired because she had that disease.").

In holding otherwise, the district court mistakenly relied on *Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995). *Siefken* involved a diabetic police officer who was successfully controlling his diabetes and thus needed no accommodation from his employer. But one day his lapse of control resulted in a severe diabetic reaction while on duty. As a consequence of this reaction, the officer "erratically drove his squad car at high speed through residential areas some forty miles outside his jurisdiction." *Id.* at 665. He was fired shortly thereafter.

In affirming the dismissal of the officer's ADA claim, the Seventh Circuit noted that the officer needed no accommodation for his diabetes and had not asked for one either before or after the incident. *Id.* at 666 & n.3. It held that the proximate cause of the officer's firing was his failure to control the effects of his diabetes, not the diabetes itself. *Id.* at 666. The court stated its holding as follows: "[W]hen an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet the employer's legitimate job expectations due to his failure to control a controllable disability, he cannot state a cause of action under the ADA." *Id.* at 667 (citation and internal quotation marks omitted).

This holding is inapplicable here for three reasons. First, unlike the officer in *Siefken*, Carter needed and received accommodation from his employer—his workload was reduced to allow him time to rest and recover between jobs. Second, the evidence in

*Siefken* clearly established that the officer's diabetes was controllable and that he was fired because his failure to control it on the occasion in question made him a potential danger to the public. There is no comparable evidence in the present case. Carter suffered from both diabetes and hepatitis C at the time that he was fired. And he currently takes diabetes medication but is nevertheless unable to work. We therefore cannot conclude as a matter of law that his failure to take diabetes medication during the fall of 2006 was the proximate cause of his declining health, let alone of his firing.

Finally, the officer in *Siefken* was fired because he had not met his employer's legitimate job expectations. Police officers carry guns and are entrusted with protecting the public, so a police department can legitimately "expect and require that patrol officers keep themselves functional and alert at all times while on duty." *Burroughs v. City of Springfield*, 163 F.3d 505, 507-09 (8th Cir. 1998) (adopting *Siefken*'s holding in a case with similar facts). The officer in *Siefken* did not live up to this standard. As his counsel put it at oral argument in that case, the officer wanted a "second chance" to allow him to meet his employer's legitimate job expectations. *Siefken*, 65 F.3d at 666.

Carter, however, argues that he *met* Pathfinder's legitimate job expectations, but was fired because Pathfinder no longer wanted to provide him with the accommodation that it had provided for the prior two months (and that it has conceded was a reasonable one). He has therefore established the existence of a genuine dispute of material fact as to the third and final element of his prima facie showing.

### 2. *Pathfinder's reason for firing Carter*

Carter having established his prima facie case, the burden shifts to Pathfinder "to articulate some legitimate, nondiscriminatory reason" for firing Carter. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). The burden has previously been characterized by this court as "exceedingly light," *see E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011) (internal quotation marks omitted), and we have little trouble finding that Pathfinder has carried it here. Arnold's deposition testimony states that he fired Carter based on "two instances": Carter's altercation with the MWD at the Ultra job site and his use of an expletive before abruptly hanging up on Arnold over the telephone. These reasons "on their face are legitimate and non-discriminatory." *See id.* So the burden of proof shifts back to Carter.

### 3. *Pretext*

At the final stage of the *McDonnell Douglas* burden-shifting framework, Carter must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *See Reeves*, 530 U.S. at 143 (internal quotation marks omitted). Carter may establish pretext by "introducing affirmative evidence of a discriminatory motive," *see Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008), or by showing that Pathfinder's "proffered explanation is unworthy of credence," *see Reeves*, 530 U.S. at 143 (internal quotation marks omitted). He need not, however, prove that the

discriminatory motive was the sole reason for his firing; rather, he must show only that it was a "determining factor." *See Adamson*, 514 F.3d at 1146 (internal quotation marks omitted).

The district court characterized Carter's evidence of pretext as only "a scintilla." It reasoned that Carter was fired for his "grouchiness," which was caused by his failure to control his diabetes. But Carter testified in his deposition that Arnold, when firing Carter, told him that other drillers were working 25 to 26 days per month, and they might start quitting if he was not fired. Carter also testified that Arnold said that Carter could not work 24-hour shifts like the others. These statements support the inference that Carter's disability—or, put differently, Pathfinder's desire to no longer provide reasonable accommodation for his disability—was a "determining factor" in his firing.

Of course, Arnold also mentioned Carter's altercation with the MWD during the same conversation. And this too may have been a motivating factor in Pathfinder's decision to fire Carter. But in the context of the oil field, where employees complete strenuous tasks and work long shifts, the occasional spat between coworkers seems inevitable. The same is true for Carter's use of an expletive in his conversation with Arnold. Moreover, even assuming that Pathfinder's justification "would have provided a valid reason for terminating [him] under the applicable law, a reasonable jury could have nonetheless concluded that [he] was *actually* fired because of [his] disability." *See E.E.O.C. v. Heartway Corp.*, 466 F.3d 1156, 1167–68 (10th Cir. 2006) (emphasis in original) (holding that a cook who had hepatitis C could potentially show that she was

fired because of her disability, even assuming that her employer's stated explanation for firing her—because she lied about her hepatitis on her job application—was a legitimate one).  Viewing the record as a whole, we conclude that Carter has produced enough evidence to raise a genuine dispute of material fact as to whether the stated reason for his firing was pretextual.

Pathfinder's arguments to the contrary are unavailing.  In addition to Pathfinder's assertion that its proffered reason for firing Carter is its true reason, Pathfinder makes two arguments that deserve comment here.  First, although it does not explicitly address the question of pretext in its brief, Pathfinder argues that Arnold's statements to Carter are "not sufficient to raise an issue of fact for trial" because "[n]one of these statements, without inference, demonstrate that Arnold intended to terminate Carter because of an alleged disability."  (Emphasis in original.)  To the extent that Pathfinder is suggesting that Carter must provide direct evidence of discrimination to prevail on his ADA claim, Pathfinder is wrong as a matter of law.  Submitting direct evidence of discrimination is certainly one way for a plaintiff to prove discrimination under the ADA.  But it is not the only way.  "Under *McDonnell Douglas*, a plaintiff may survive summary judgment by providing circumstantial rather than direct evidence of discrimination." *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1278 (10th Cir. 2010).

Second, Pathfinder contended during oral argument that Carter was unable to establish pretext because he could not show that similarly situated employees were treated differently than he was.  But this argument overlooks that "there is no one specific mode

of evidence required to establish the discriminatory inference." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158 (10th Cir. 2008). Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (internal quotation marks omitted). Pathfinder wants Carter to produce a particular kind of evidence to show pretext, but "[a] plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Id.* (brackets and internal quotation marks omitted).

In sum, we hold that Carter has produced enough evidence to survive summary judgment on his ADA claim. A reasonable jury could conclude that he has made out a prima facie case of discrimination and has established that Pathfinder's asserted justification for his firing was pretextual. At this stage of the case, that is enough. *See Reeves*, 530 U.S. at 148 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

## C.    Carter's ERISA claim

Carter also appeals from the district court's grant of summary judgment on his ERISA claim. He argues that Pathfinder violated ERISA by intentionally interfering with his benefits under the statute. *See* 29 U.S.C. § 1140 ("It shall be unlawful for any person

to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .").

To prevail on his claim, Carter "must establish by a preponderance of the evidence . . . that [his] discharge was motivated by an intent to interfere with employee benefits protected by ERISA." *Trujillo*, 524 F.3d at 1160 (internal quotation marks omitted). He "is not required to show that the employer's sole motivation was to interfere with employee benefits, [he] need only show that it was a motivating factor." *Garratt v. Walker*, 164 F.3d 1249, 1256 (10th Cir. 1998) (en banc). However, "no action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination." *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir. 1991) (internal quotation marks omitted). The critical question, therefore, is whether Carter "was fired to prevent h[im] from receiving benefits." *Hopkins v. Seagate*, 30 F.3d 104, 106 (10th Cir. 1994).

Carter claims that he was fired for such a reason because he told Arnold that Pathfinder "can't just take [his disability] benefits away," and that he would see Arnold and Pathfinder "in court" if it did. Arnold responded by saying: "You won't see me in court." But Arnold's statement on its own is not enough to give rise to the inference that Arnold was motivated by an intention to interfere with Carter's employee benefits; it suggests only that Arnold did not expect to see Carter "in court."

-28-

We therefore concur in the district court's conclusion that, although "Carter made a passing reference to disability benefits in December 2006, his supervisor's response . . . [s]tanding by itself . . . cannot reasonably be viewed as evidence that a possible future claim by Carter for disability benefits was a motivating factor behind Carter's termination."  Because Carter has failed to raise a genuine dispute of material fact as to whether Pathfinder was motivated by an intent to interfere with his ERISA rights, he cannot prevail on this claim.

**D.      Carter's breach-of-contract claim**

Finally, Carter appeals from the district court's grant of summary judgment in favor of Pathfinder on his breach-of-contract claim.  He contends that summary judgment was inappropriate because a genuine dispute of material fact exists as to whether the disciplinary policies set forth in Pathfinder's employee handbook created an implied-in-fact contract of employment.

Both parties agree that Wyoming law governs the interpretation of their contractual relationship.  "In Wyoming, employment is presumed to be at will." *Trabing v. Kinko's, Inc.*, 57 P.3d 1248, 1252 (Wyo. 2002).  "This presumption may, however, be modified by either an express or implied-in-fact contract." *Id.*  An implied-in-fact contract "arises from a mutual agreement and intent to promise which is found in the acts or conduct of the party sought to be bound." *Id.* (internal quotation marks omitted).

For the same reasons as set forth by the district court, we conclude that no mutual agreement to create an employment contract existed here.  All the documents that Carter

signed at the commencement of his employment with Pathfinder make clear that Carter's employment was at will and that he could be terminated at any time, with or without cause. Further, the documents all explicitly state that Pathfinder was not bound by any prior agreement or representations. The fact that Pathfinder's employee handbook—which was given to Carter *before* he read and signed the relevant documents—contains a progressive disciplinary policy is therefore immaterial. *See id.* at 1254. "When the language in a written contract is unambiguous, the intention of the parties shall be ascertained from the plain language of the contract." *Id.* Carter's breach-of-contract claim is thus without merit.

## III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the district court's grant of summary judgment on Carter's ADA claim, **AFFIRM** the district court's grant of summary judgment on Carter's remaining claims, and **REMAND** the case for further proceedings on the ADA claim.